UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MARK A. NEWTON,<br>3325 Norwood Road<br>Shaker Heights, Ohio 44122 | ) ) ) ) | Case No. 1:17 CV 2545 |
| -and- | ) ) | |
| PATRICIA RIDEOUT,<br>3325 Norwood Road<br>Shaker Heights, Ohio 44122 | ) ) ) ) | |
| Plaintiffs,<br>vs. | ) ) ) | Judge James S. Gwin |
| JACQUELYN ELLIS,<br>3337 Old Brainard Road<br>Pepper Pike, Ohio 44124 | ) ) ) ) | |
| -and- | ) ) | |
| RODNEY ELLIS,<br>3337 Old Brainard Road<br>Pepper Pike, Ohio 44124 | ) ) ) ) | **FIRST AMENDED COMPLAINT**<br><br>**(Jury Demand Endorsed Hereon)** |
| -and- | ) ) | |
| ANDREA ELLIS,<br>3337 Old Brainard Road<br>Pepper Pike, Ohio 44124 | ) ) ) ) | |
| -and- | ) ) | |
| CITY OF SHAKER HEIGHTS,<br>3400 Lee Road<br>Shaker Heights, Ohio 44120 | ) ) ) ) | |
| -and- | ) ) | |
| CHIEF JEFFREY DeMUTH<br>c/o Shaker Heights Police Department<br>3355 Lee Road<br>Shaker Heights, Ohio 44120 | ) ) ) ) ) | |

-and-                                              )
                                                   )
COMMANDER JOHN COLE                                )
c/o Shaker Heights Police Department               )
3355 Lee Road                                      )
Shaker Heights, Ohio 44120                         )
                                                   )
        -and-                                      )
                                                   )
SGT. MARVIN LAMIELLE                               )
c/o Shaker Heights Police Department               )
3355 Lee Road                                      )
Shaker Heights, Ohio 44120                         )
                                                   )
        -and-                                      )
                                                   )
DET. JESSICA PAGE,                                 )
c/o Shaker Heights Police Department               )
3355 Lee Road                                      )
Shaker Heights, Ohio 44120                         )
                                                   )
        -and-                                      )
                                                   )
DET. WALTER SIEGEL,                                )
c/o Shaker Heights Police Department               )
3355 Lee Road                                      )
Shaker Heights, Ohio 44120                         )
                                                   )
        -and-                                      )
                                                   )
JOHN AND/OR JANE DOES 1-5                          )
c/o Shaker Heights Police Department               )
3355 Lee Road                                      )
Shaker Heights, Ohio 44120                         )
                                                   )
                Defendants.                        )

Now come the Plaintiffs, Mark A. Newton and Patricia Rideout, by and through

undersigned counsel, and for their Complaint against all Defendants, state as follows:

## NATURE OF THE ACTION

1.      This is a civil-rights and personal injury action brought pursuant to 42 U.S.C. §

1983, as well as under Ohio state law for defamation, civil conspiracy, malicious

prosecution, abuse of process, intentional infliction of emotional distress, and loss of consortium.

2.     As outlined in further detail throughout this Complaint, Plaintiffs allege that Defendant Jacquelyn Ellis, individually and/or as part of a conspiracy with Defendant Rodney Ellis and/or Andrea Ellis (hereinafter collectively "the Ellis Defendants") and/or Defendant City of Shaker Heights, and/or Chief Jeffrey DeMuth, Commander John Cole, Sargent Marvin Lamielle, Detective Jessica Page, Detective Walter Siegel, and John/Jane Does 1-5 (hereinafter collectively "the SH Defendants"), levied false allegations of rape and sexual assault against Plaintiff Newton, for the purpose of obtaining a financial payout from Plaintiffs and/or The Laurel School for Girls (hereinafter "Laurel"), which resulted in Plaintiff Newton's criminal indictment, prosecution and trial.

3.     Plaintiffs further allege that Defendant Jessica Page, violated Plaintiff Mark A. Newton's (hereinafter "Plaintiff Newton") state and federal constitutional rights to due process of law and a fair trial pursuant to the Ohio Constitution and the Fifth, Sixth and Fourteenth Amendment to the United States Constitution by intentionally, willfully, maliciously, and in bad faith, under color of official title, suppressing/concealing/destroying and/or withholding materially exculpatory and/or potentially useful evidence, from the State to prevent the disclosure of said evidence to the Defense during Plaintiff Newton's criminal prosecution and trial, for the purpose of increasing the odds that Plaintiff Newton would be wrongfully convicted of the sexual assault charges at trial.

4.     Plaintiffs further allege that Defendant Page's supervisors, the SH Defendants, directly participated in Defendant Page's unconstitutional conduct, and/or directed, ordered, authorized, approved, encouraged and/or knowingly acquiesced to Defendant Page's

unconstitutional conduct, as outlined above and throughout this Complaint, which resulted in the deprivation of Plaintiff Newton's state and federal constitutional rights to due process of law and a fair trial pursuant to the Ohio Constitution and the Fifth, Sixth and Fourteenth Amendment to the United States Constitution.

5.      Plaintiffs further allege the SH Defendants failed to properly train and/or supervise Defendant Page and that said failure was due to an illegal policy, practice and/or custom of the SH Defendants that would cause a constitutional violation, *and which in fact caused* a violation of Plaintiff Newton's state and federal constitutional rights to due process of law and a fair trial pursuant to the Ohio Constitution and the Fifth, Sixth and Fourteenth Amendment to the United States Constitution.

6.      Plaintiffs further allege that as a result of the Defendants' tortious conduct as outlined through, the Defendants committed the torts of defamation, civil conspiracy, malicious prosecution, abuse of process, intentional infliction of emotional distress, loss of consortium against Plaintiffs, causing Plaintiffs to incur significant general and special damages.

7.      On May 11, 2017, the trial judge dismissed the criminal proceedings against Plaintiff Newton with prejudice after the trial judge determined that Defendant Jessica Page, the lead detective in Plaintiff Newton's criminal case, acting under color of state law and in bad faith, suppressed, withheld and/or destroyed materially exculpatory and/or potentially useful evidence to Plaintiff Newton to prevent the disclosure of the evidence to Plaintiff Newton's defense counsel during the criminal case, thereby violating Plaintiff Newton's constitutional rights to due process and a fair trial.

**THE PARTIES**

8.    Plaintiff Mark A. Newton is and was at all times relevant herein, an adult residing in Cuyahoga County, Ohio.

9.    Plaintiff Patricia Rideout, Plaintiff Newton's wife, is and was at all times relevant herein, an adult residing in Cuyahoga County, Ohio.

10.    Defendant Jacquelyn Ellis (D.O.B. 1-27-1999) (hereinafter "Defendant J. Ellis") is, upon information and belief, an adult residing in Ann Arbor, Michigan. Though, at all times relevant, Defendant J. Ellis resided in Cuyahoga County, Ohio.

11.    Defendant Rodney Ellis (hereinafter " Defendant R. Ellis") is and was at all times relevant herein, an adult residing in Cuyahoga County, Ohio. Defendant R. Ellis is being sued in his individual capacity as well as in his capacity as the father and legal guardian of Defendant J. Ellis, for any and all conduct of Defendant J. Ellis that occurred prior to her reaching the age of majority.

12.    Defendant Andrea Ellis (hereinafter " Defendant A. Ellis") is and was at all times relevant herein, an adult residing in Cuyahoga County, Ohio. Defendant A. Ellis is being sued in her individual capacity as well as in her capacity as the mother and legal guardian of Defendant J. Ellis, for any and all conduct of Defendant J. Ellis that occurred prior to her reaching the age of majority.

13.    Defendant City of Shaker Heights is a municipality in the Cuyahoga County, Ohio, is subject to governmental liability in connection with claims asserted in this Complaint, and is located within the Northern District of Ohio.

14.    Defendants Chief Jeffery DeMuth Commander John Cole Sgt. Marvin Lamielle, Det. Jessica Page, Det. Walter Siegel, and John and/or Jane Does 1-5 are and/or were law

enforcement officers who were at all times relevant to this action employed by the Defendant City of Shaker Heights (collectively referred to as "the SH Defendants") as law enforcement officers with the Shaker Heights Police Department ("SHPD") and were at all times relevant hereto acting under color of law. Defendants Chief Jeffery DeMuth Commander John Cole Sgt. Marvin Lamielle, Det. Jessica Page, and Det. Walter Siegel and John and/or Jane Does 1-5 are sued in their individual and official capacities.

## JURISDICTION AND VENUE

15.     This action arises under the laws of the United States, and jurisdiction is conferred on this Court under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights). Supplemental jurisdiction of this Court over the claims arising under state law is invoked under 28 U.S.C. § 1367 (supplemental jurisdiction). Venue in the Northern District of Ohio, Eastern Division is proper under 28 U.S.C. § 1391(b), because it is in the district in which many, if not all, of the defendants reside, and because all of the events or omissions giving rise to the claims occurred within the Northern District of Ohio, Eastern Division.

## FACTUAL BACKGROUND

16.     At all times relevant herein, Plaintiff Mark A. Newton had clearly established state and federal constitutional rights to due process of law in criminal proceedings, a fair criminal trial pursuant to the Ohio Constitution and the Fifth, Sixth and Fourteenth Amendment to the United States Constitution.

17.     Plaintiff Mark A. Newton is an attorney in good standing and licensed to practice law in the State of Ohio. Plaintiff Newton was admitted to the Ohio Bar in 1984 and is assigned attorney registration number 0022298.

18.     From 1985 through 1990, Plaintiff Newton worked as an assistant prosecuting attorney for the City of Toledo.

19.     In 1999, Plaintiff Newton began his teaching career and took a job teaching Seventh Grade History at Wiley Middle School in Cleveland Heights, Ohio. Shortly thereafter, Plaintiff Newton began teaching at Hathaway Brown School for Girls, located in Shaker Heights Ohio.

20.     From 2000 through 2008, Plaintiff Newton worked as a Sixth Grade English and History teacher at Hathaway Brown School for Girls, located in Shaker Heights, Ohio. Plaintiff Newton also coached Middle School softball during his tenure at Hathaway Brown.

21.     In 2008, Plaintiff Newton was hired by The Laurel School for Girls located in Shaker Heights Ohio, as a Middle School History teacher and Middle School Softball coach.

22.     From 2008 through 2013, Plaintiff Newton worked as a Middle School teacher and Middle School Softball coach at Laurel.

23.      Initially, Plaintiff Newton worked as a teacher and coach at Laurel full-time. In approximately 2011, Plaintiff Newton decided to devote more time to his law practice and thus he began to teach and coach Middle School students at Laurel on a part-time basis.

24.     Plaintiff Newton was the Head Coach for Laurel's Middle School softball team from 2009 through 2013. Non-party teacher and Laurel School Employee Sally Hacala, worked as Plaintiff Newton's assistant softball coach, during these years.

25.     During the 2011-12 school year, Defendant J. Ellis was a Seventh Grade Student at Laurel. Defendant J. Ellis played on the school's softball team, which Plaintiff Newton and Ms. Hacala coached.

26.     During the 2012-2013 school year, Defendant J. Ellis was an Eighth Grade Student at Laurel. Defendant J. Ellis was a pitcher/player on Laurel's Middle School softball team.

27.     Laurel's softball season for the 2012-2013 school year ended in May of 2013 and the school year ended in June of 2013.

28.      Following the 2012-2013 school year, Plaintiff Newton voluntarily left his position as a teacher and coach for Laurel to focus solely on his law practice.

29.     At no point in time during any of Plaintiff Newton's years of teaching was Plaintiff Newton ever disciplined for any conduct.

### • Defendant J. Ellis Makes False Allegations of Sexual Assault Against Plaintiff Newton and Chronology of Subsequent Relevant Events

30.     In August of 2014, Defendant J. Ellis began her sophomore year at Laurel.

31.     On or about August 24, 2014, Defendant J. Ellis told her friend, Jillian Aveni, that approximately eighteen (18) months earlier, when she was in the Eighth Grade, Plaintiff Newton sexually assaulted her on two (2) separate occasions in an equipment room during indoor softball practices at Laurel.

32.     Any and all of Defendant J. Ellis' stated allegations of sexual assault against Plaintiff Newton were false, malicious, made in bad faith, and *per se* defamatory.

33.     On or about October 10, 2014, Defendant J. Ellis told her parents, Defendant A. Ellis and Defendant R. Ellis that approximately eighteen (18) months earlier, when she was in the Eighth Grade, Plaintiff Newton sexually assaulted her on two (2) separate occasions in an equipment room during indoor softball practices at Laurel.

34.     Notwithstanding the allegations, Defendants A. Ellis and R. Ellis did not take Defendant J. Ellis to the hospital, to seek medical attention, or to the police, nor did they notify anyone of Defendant J. Ellis' allegations.

35.     Instead, the Ellis Defendants decided that they would wait five (5) days, to October 15, 2014, so that Defendant J. Ellis could disclose the allegations to her therapist during an upcoming, previously scheduled one-on-one therapy session.

36.     Upon belief, Defendants A. Ellis and R. Ellis knew, either immediately or soon thereafter, of the falsity of Defendant J. Ellis' allegations against Plaintiff Newton and either initially, or shortly thereafter, the Ellis Defendants conspired to perpetuate Defendant J. Ellis' false allegations against Plaintiff Newton for the purpose of seeking money damages against The Laurel School and Plaintiff Newton in the future.

37.     Upon belief, the Ellis Defendants conspired to have Defendant J. Ellis disclose the alleged sexual assaults to her therapist on October 15, 2014 because they knew that Defendant J. Ellis' therapist was a mandatory reporter of child abuse and because they believed the disclosure to her therapist, as opposed to Defendant J. Ellis' disclosure to them, would strengthen their ability to seek money damages against The Laurel School and Plaintiff Newton in the future.

38.     Thereafter, on October 15, 2014, as planned, during a afternoon one-on-one therapy session with her therapist, Defendant J. Ellis again, falsely alleged that approximately eighteen (18) months earlier, when she was in the Eighth Grade, Plaintiff Newton sexually assaulted her on two (2) separate occasions (hereinafter "the therapist disclosure").

39.     Immediately following the therapy session, Defendant J. Ellis' therapist communicated Defendant J. Ellis' allegations of sexual assault against Plaintiff Newton to her mother, Defendant A. Ellis.

40.     Either on or before October 15, 2014—the date of Defendant J. Ellis' allegations of sexual assault to her therapist—Defendant A. Ellis and/or Defendant R. Ellis contacted and retained Attorney John O'Neil of the law firm Elk & Elk.

41.     On or about October 16, 2014, Defendant A. Ellis sent an email to Laurel School's Head of School Ann Klotz, in which Defendant A. Ellis communicated to Ms. Klotz Defendant J. Ellis' false allegations against Plaintiff Newton.

42.     On October 17, 2014, both the therapist, and Ann Klotz reported Defendant J. Ellis' false allegations against Plaintiff Newton to the Ohio Department of Job and Family Services.

43.     Also on October 17, 2014, Ms. Klotz advised the Laurel School's board of directors, as well as several school administrators, teachers and employees of Defendant J. Ellis' allegations of sexual assault against Plaintiff Newton.

44.     Defendant J. Ellis continued to make defamatory statements against Plaintiff Newton and perpetuate her false allegations of sexual assault against Plaintiff Newton during various discussions with therapists and other medical professionals from October 2014 through the present.

45.     On October 21, 2014, during a one-on-one meeting with Laurel School's Head of School Ann Klotz, Defendant J. Ellis again, falsely alleged that approximately eighteen (18) months earlier, when she was in the Eighth Grade, Plaintiff Newton sexually assaulted her.

46. However, Defendant J. Ellis' statements to Ms. Klotz were materially inconsistent with her previous statements to her therapist.

47. On January 7, 2015, as a result of Defendant J. Ellis' false allegations against Plaintiff Newton, Ms. Klotz, published and sent a letter to all Laurel School Families and Alumnae concerning Defendant J. Ellis' allegations of sexual assault against Plaintiff Newton. The letter did not specifically name Plaintiff Newton as the individual accused of sexual assault.

48. On January 29, 2015, during a one-on-one meeting with Jennifer Dougherty of Summit County Child Services (hereinafter "Case Worker Dougherty"), Defendant J. Ellis again, falsely alleged that approximately eighteen (18) months earlier, when she was in the Eighth Grade, Plaintiff Newton sexually assaulted her on two (2) separate occasions in an equipment room during indoor softball practices at Laurel.

49. However, Defendant J. Ellis' statements to Case Worker Dougherty were materially inconsistent with her previous statements to both her therapist and Ann Klotz.

50. Specifically, during her meeting with Dougherty, Defendant J. Ellis falsely alleged that during the alleged assaults, Plaintiff Newton put his hands down her pants *only*, while Defendant J. Ellis was allegedly alone with Plaintiff Newton inside of the equipment room.

**• Det. Page's First Interview of Defendant J. Ellis on March 23, 2015 and Det. Page's Biased, Bad Faith Investigation Into Defendant J. Ellis' Allegations**

51. On March 23, 2015, Defendant J. Ellis arrived at the Shaker Heights police Department for a scheduled interview with Defendant Det. Jessica Page, regarding her allegations of sexual assault against Plaintiff Newton.

52.     Defendant Page was assigned as the lead Detective in the investigation of Plaintiff Newton stemming from Defendant J. Ellis' allegations of sexual assault.

53.     The investigation into Plaintiff Newton was Defendant Page's first, major investigation as a Detective and was very important to Defendant Page.

54.     During the March 23, 2015 interview with Defendant Page, Defendant J. Ellis again falsely alleged that in April and May of 2013, when she was in the Eighth Grade, Plaintiff Newton sexually assaulted by putting his hands <u>down her pants only, and not up her shirt,</u> her on two (2) separate occasions in an "equipment room" during indoor softball practices at Laurel.

55.     Even though Det. Page had never spoken to or met Defendant J. Ellis prior to March 23, 2015, and even though Det. Page had not yet spoken to Plaintiff Newton, during the first interview, Det. Page advised Defendant J. Ellis that she was her "advocate."

56.     Additionally, Det. Page made the following statements to Defendant J. Ellis during the first interview, which evidence Det. Page's unethical, unprofessional, unconstitutional, willful, spiteful, bad faith, and malicious bias against Plaintiff Newton, her lack of neutrality and immediate personal attachment to Defendant J. Ellis, and her bad faith objective and motivation to convict Plaintiff Newton or ruin his reputation, regardless of the information or evidence, in violation of Plaintiff Newton's state and federal constitutional rights:

   a) DP: And, I hope that you don't continue to blame yourself for this. I hope that you are getting through it and are working through it….Um, cause this is his issue, obviously. **This is something that was wrong with him**. This isn't anything you brought on….Um, you know, I, I just… **it really bothers me to see a young lady like yourself have to go through something like this.** Um and I hope that this whole process like talking about it now is helping **<u>you</u>**….

b) DP: Well you shouldn't feel stupid. I would have trusted my coaches the same way…It's not, it's got nothing to do with you personally. So, don't feel stupid and most of the people that I talk to who have been victims of sexual assault like this, um, they feel the same way you do, you know, "I feel dumb. Why didn't I know? Why didn't I say something?" Because you can't because you're frozen. **Because you trusted this person and, this person betrayed your trust…**

c) DP: What makes you think that he's done it to other people?
JE: He worked at Hathaway Brown several years before he came to Laurel. I… it just wouldn't surprise me.
DP: **Ok. It would not surprise me either…**

d) DP: **Hopefully the school will do their job and kinda delve into what, a little more, to see if there are other victims.** Um, but he is aware that someone has made an allegation. **He of course has an attorney cause he is an attorney.** Um, and said that whenever I want to talk to him I can talk to him. …So, he's making himself available to me. **My guess is he's going to come in here and deny everything. …**

e) DP: [W]hat do you think should happen to him?
JE: Personally I wish he could be killed.
DP: **That's an appropriate response.**

f) DP: I'm not going to lie to you. It's going to be a he said she said because there is no physical evidence. But, I want to know um how you feel about stepping through this process. **Cause I'll be with you most of the way. Um, even down to the court proceedings.** Down to…you'll probably have to get on the stand and testify in front of a jury if it goes to a jury trial. Um, which is why I wanted to get you to kinda talk a little more about the sexual assault <u>that happened</u>. **Because when you get in front of them, that's how you're gonna have to be very descriptive about that part of the assault.** I know it sucks, and these are 12 strangers. I'm just, you know, one, pregnant Detective lady, I'm easy to talk to who reads the same book as you. These are 12 people that you have never met. A judge, him, the prosecutor. It's all very scary I know that. **Um, but I think, and this is just me personally, everybody is different, I think this is the best course of action for you to be ok with this the rest of your life.**

g) DP: Like I said, I'm not going to lie to you. **Um, but you are not a bad witness. You are very certain about particular things** . . . but what this would boil down to is your word against his And it's very possible a jury could say, "Nope I believe him more," or "Nope, I believe her more." **Um, but what you are doing is <u>you're putting the truth about what happened to yourself out there</u> no matter what the outcome is. Once someone is accused of being a sexual impositionist or someone who touches young ladies and takes advantage of their trust…there is no going back from that, whether you're convicted or not….**
\*\*\*
**Um, so when you Google Mr. Newton's name…say…say we go through the process and say your worst fear comes true… that he is not convicted…The first thing that**

is going to come up when you Google his name is Mark Newton, ugh, you know, Tried as…essentially a rapist…child…you know…molester. Um, Michael Jackson. The stigma that carries with being accused of something like that is almost far greater than being in prison. **I like seeing people go to prison though, don't get me wrong!**

Um, so, I will be here and **I'll walk with you through the whole thing and I'll fight as hard as I can and I'll get as much evidence as I can and I'll talk to as many of those girls as I can and I'll try and find everything that I can find, um, <u>to help you</u>**….

But this is going to be a lot of leg-work on my end. **So I just want to be certain that your wishes are taken into consideration with me <u>cause that's what I care about.</u>  I can't kill him.** But I understand that is a pretty natural reaction.  I could tell you if someone touched one of my kids…. That's how I would feel. I'm sure that is how your dad feels.  I'm sure that's how your mom feels.  I might actually kill someone if they… I understand that level of frustration, I can see that, yes.  <u>**Um, our next best thing is to try to get him convicted.**</u>

I just want to make sure you are on board with me with that. **Cause I don't want to step you back emotionally or mentally or spiritually, <u>because I think that is the most important thing is your well-being. So everything I'm doing is going to be geared toward you and your well-being.  You are the victim here, ok?... I'll do whatever my victim wants me to do.</u>**

57.    The room where the alleged assaults occurred, described as the "equipment room" by Defendant J. Ellis, was later identified to be Room Number G003 (hereinafter "Room G003", "the room" or "the equipment room") within Laurel.

58.     Significantly, throughout Det. Page's entire investigation, however, Defendant J. Ellis' statements regarding Room G003, and the location and contents of Room G003 were "always a major issue".

59.    During the March 23, 2015 interview, at Defendant Page's direction, Defendant J. Ellis prepared a diagram of the gymnasium and equipment room area inside Laurel where she alleged the sexual assault to have occurred (hereinafter "the first diagram").

60.     Following the first interview, Det. Page took Defendant J. Ellis' first diagram and "put it into a manila envelope, marked it, filled out the property tag for it, [and] submitted it into evidence."

61.     Throughout her investigation into Plaintiff Newton, Det. Page collected and properly submitted *hundreds* of documents, records and other items into evidence, including two (2) other hand-drawn diagrams by witnesses of Laurel's equipment room/ gymnasium area and over ten (10) recorded interviews of witnesses.

### • Defendant J. Ellis' Surreptitious Whispering During The First Interview

62.     During a break in the first interview, as Det. Page used the restroom, Defendant J. Ellis sat quietly alone at the table in the interview room reading a book. Suddenly, Defendant J. Ellis glanced up from her book and, in a state of sudden realization, stared at the first diagram that she drew only moments earlier. Then, unaware she was being recorded**, Defendant J. Ellis turned her head, leaned into her right shoulder, and whispered into the top right pocket of her zip-up jacket.**

63.     Throughout her investigation into Plaintiff Newton, Det. Page collected and properly submitted *nearly one thousand (1,000)* documents, records and other items into evidence, including two (2) other hand-drawn diagrams (one drawn by witness Ellie Durdle and another drawn by Plaintiff Newton) of Laurel's equipment room/ gymnasium area, nearly one hundred (100) pictures Det. Page took of Laurel's equipment room/ gymnasium area, and over ten (10) recorded interviews of witnesses.

64.     On or about April 27, 2015, Det. Page received and reviewed SCCS's Case Worker Jennifer Dougherty's interview notes from her January 29, 2015 meeting with

Defendant J. Ellis, in which Defendant J. Ellis alleged that Plaintiff Newton put his hands down her pants only.

65.    On August 24, 2015, Det. Page interviewed Laurel School math teacher and former assistant softball coach to Plaintiff Newton, Sally Hacala.

66.    Sally Hacala advised Det. Page that the room that Defendant J. Ellis claimed was an "equipment room", where the alleged assaults occurred, was not an "equipment room" during 2012-13, but instead it was used as an art room and no sports equipment was located inside the room at that time.

67.    On January 12, 2016, Det. Page interviewed Laurel's Head of School, Ann Klotz.

68.    Ms. Klotz advised Det. Page that on October 21, 2014, Defendant J. Ellis told her that "at the end of the season in May or June of 2013," Plaintiff Newton put his hands up her shirt *only*, "several times" while Defendant J. Ellis was allegedly alone with Plaintiff Newton inside of the "softball storage room."

69.    On February 3, 2016, per her police report, Det. Page learned, for the first time, the details and specifics of the sexual assault allegations that Defendant J. Ellis made against Plaintiff Newton during the October 15, 2014 therapist disclosure.

70.    On February 3, 2016, Det. Page *knew* that Defendant J. Ellis' allegations of sexual assault against Plaintiff Newton made during the October 15, 2014 therapist disclosure were materially inconsistent with the allegations Defendant J. Ellis' later made to Case Worker Dougherty and Ann Klotz.

71.    In addition Defendant J. Ellis' allegations against Plaintiff Newton as stated to her therapist, Case Worker Dougherty, and Ann Klotz, as well as Sally Hacala's statements, each of which clearly revealed material inconsistencies and factual impossibilities in Defendant J.

Ellis' allegations, throughout Det. Page's investigation, Det. Page became aware of numerous additional material inconsistencies and factual impossibilities in Defendant J. Ellis's allegations.

72.     Nevertheless, Det. Page intentionally omitted and/or failed to report and/or investigate said material inconsistencies and impossibilities, as any such report and/or investigation would compromise her goal of convicting Plaintiff Newton in a criminal trial.

73.      Plaintiffs will introduce evidence of said additional material inconsistencies and factual impossibilities in Defendant J. Ellis's allegations, and Det. Page's intentional material omissions and/or failures to investigate said matters, in Det. Page's cumulative, ongoing violation of Plaintiff Newton's constitutional rights, at the trial herein.

### • Det. Page & Det. Walt Siegel's Second Interview of Defendant J. Ellis on April 21, 2016

74.     In approximately April 2016, Det. Page approached SHPD Det. Walter Siegel to assist her in her investigation.

75.     Thereafter, Det. Siegel sat in on two (2) interviews with Det. Page—the April 14, 2016 follow-up interview with Plaintiff Newton, and the April 21, 2016 follow-up interview with Defendant J. Ellis.

76.     To prepare for the April 21, 2016 follow-up interview of J.E and to familiarize himself with the case, Det. Siegel reviewed the tape of Det. Page's March 23, 2015 first interview of Defendant J. Ellis. While doing so, Det. Siegel discovered Defendant J. Ellis surreptitious whispering during the first interview; Det. Siegel quickly brought Defendant J. Ellis surreptitious whispering to Det. Page's attention.

77.     Thereafter, Det. Page and Det. Walter Siegel reviewed the tape several times and believed that what Defendant J. Ellis secretly whispered to herself was the phrase(s), **"I**

**think she got the storage room wrong**" or "**I don't think she had the storage room right**".

78.     Given that there were "a lot of questions" and "disagreements" as to the contents of Room G003 at the time of the alleged assault, Det. Siegel recognized Defendant J. Ellis' secret whispering about the room to be "<u>very important.</u>"

79.     On April 21, 2016, during the follow-up interview of Defendant J. Ellis, Det. Siegel and Det. Page confronted Defendant J. Ellis about her surreptitious whispering they observed on the tape of the first interview. Specifically, Det. Page and Det. Siegel spent the first sixteen (16) minutes of the second interview questioning Defendant J. Ellis about her surreptitious whispering. The following exchange occurred:

DP:     I reviewed the video from our incident, because I went back and listened it because I wanted to write down everything we said, and I noticed that when I went out of the room to use the bathroom, I noticed that you talked into your sleeve. So, my question to you is, did you have something recording? **It's ok if you did.**

JE:     I didn't

DP:     You didn't?

JE:     No

DP:     It's really weird, you're reading your book and then you kinda rub your face and you say something like, " I think she's recording this."

**DS:     Ah, didn't you say something like "I think she got the room wrong," or something?**

**DP:     Actually, yeah, "I think she got the room wrong." It's right here, I took a picture of right exactly where it is.**   *(Showing J.E. Screenshot from 3-23-15 First Interview of J.E.'s Suspicious Whispering).*

JE:      Um, no.  I don't have anything… recording, I don't …ah I almost wore that sweatshirt today.

**DS:     <u>You…she walked out the room, you're reading your book, you took a look at this drawing that she had on the thing and then you turned and go said, "I don't think she had the storage room right" is what it sounded like….</u>**

JE:     No I don't remember saying anything.  I didn't have anything on me.

DP:     Did…I wouldn't…I'll tell you this…you have…it's not against the law to record me.  So if your civil attorney told you to record me I'm not going to be mad at you that you did.

DS:     Because we can show you the video if it would help refresh your memory.

DP:     We can show it to you if you want?

| | |
|---|---|
| JE: | Sure, but I…. |
| DS: | Cause we're just kinda curious what you were…. |
| **DP:** | **What we are thinking about is, when and if this goes to trial the other attorney is going to have access to these interviews between… they are going to have access to everything…and what I don't want is for that attorney to see this and go, "why is this person talking into their sleeve?" <u>Cause it looks bad.</u>** |
| JE: | Oh, it definitely does, but I don't…I was not talking to anyone. I don't remember doing that. |
| *** | |
| **DP:** | **<u>So that's, that's my biggest concern, right there.</u>** |
| JE: | Yeah. |
| **DP:** | **He has stuff at his desk that actually can turn outside noise down and then maybe then you'll remember why you said it…** |
| *** | |
| **DP:** | **I seriously don't care if you did record me, but that's what it looked like when we looked at it. So, that's what we're concerned about.** |
| *** | |
| DP: | Okay. So, there's no recording of m- me and you. |
| JE: | Absolutely not. |
| *** | |
| DP: | But- But if we continue to go forward and go to trial the defense will have access to it. |
| JE: | Okay. |
| DP: | Because they're allowed to have that….Are you sure that's not the case? |
| JE: | I'm very positive. |
| **DP:** | **<u>Okay. You've never lied to me before…</u>** |

80.     Defendant J. Ellis repeatedly denied any wrongdoing and/or secret recording to the Detectives and simply asserted that she did not remember any whispering during the March 23, 2015 first interview.

81.     Also during the Second Interview, Det. Page advised Defendant J. Ellis that she wanted to "clear up some things about the room."

82.     Thereafter, Det. Page questioned Defendant J. Ellis extensively regarding the specifics of Room G003—the location where Defendant J. Ellis claimed the assault by Plaintiff Newton occurred.

83. Specifically, Det. Page questioned Defendant J. Ellis about the specific contents of Room G003 during the alleged assaults, including but not limited to, questions regarding the location of a window inside of Room G003, where Defendant J. Ellis claimed she and Plaintiff Newton were located within Room G003 during the alleged incidents, and where Defendant J. Ellis claimed that buckets of softballs and large metal storage shelving units were located in Room G003 during the two (2) alleged incidents.

84. Finally, Det. Page handed Defendant J. Ellis a white, note-pad and told Defendant Jacquelyn Ellis to "draw it," referring to Room G003 and the specifics of the room's contents.

### • Defendant J. Ellis' Second Diagram – The Withheld/ Concealed/ Suppressed Evidence

85. Following a series of questions regarding the room, Det. Page asked Defendant J. Ellis to draw a second diagram of the room and Defendant J. Ellis complied (hereinafter "the second diagram").

86. Throughout *further* discussion about the room and its contents, Defendant J. Ellis continued to draw on the second diagram during the following relevant exchanges:

DP: So on the day of that first incident, where are the balls in this room…(*pointing to second diagram)*

JE: The balls in this room-

DP: …in the equipment room?

JE: Once again, very disorganized, lets pretend this is the room. (*drawing second diagram)* This is the window. *(drawing)* This is the door. *(drawing)* And then there were shelves all along here *(drawing)*…Honestly, the balls could be here *(drawing)*, here *(drawing)*…usually around here *(drawing)*…

DP: Were they in the blue buckets? The plastic blue buckets? Do you know what color they were?

\*\*\*

DP: And what size were they?...Were they plastic or metal?

\*\*\*

DP: Plastic? Okay. I- I- I'm sure they're in the pictures that I went up and took.

JE: Probably.

DP:  Um, I should print out a couple of those pictures of the room. Just to show to her to see if its set up the same.

\*\*\*

DS:  Well, so ... How many doors are there?...T- The- So the room this happened in ... Which way does the door open?

\*\*\*

DP:  Was there a lock on the door?

\*\*\*

DP:  So you were in this corner of the room right here? You're not up against this side of the room? Where the window is? *(pointing to diagram)*

JE:  No.

DP:  So, like- there's like- Is there a dry erase board here? Do you remember? *(pointing to diagram)*

\*\*\*

DP:  Just tell me what you do remember about it. Tell me what sticks out to you. I know there's m- Is there like metal shelves, right?

JE:  There's the metal shelves….And I think there were some here- *(drawing )*And here *(drawing).* I don't remember if the dry erase board was up against by back or ... I think it was here *(pointing to diagram).*

DP:  Okay. That's fine. It could have moved too.

\*\*\*

DS:  Where was the bucket of balls?

\*\*\*

DS:  These are shelves?

JE:  Yes….Yeah, so there's like the shelves and then the bucket of balls are usually within this general area. *(pointing to diagram)*

\*\*\*

DP:  Where were you looking?

JE:  At the dust on the floor.

DP:  Which way? *(pointing to diagram)*

JE:  This corner, I was like looking doot doot doot ... *(pointing to diagram).*

\*\*\*

87.  Like the first interview, as the second interview concluded, Det. Page reaffirmed her bias against Plaintiff Newton, her advocacy for Defendant J. Ellis, and general bad faith intent in her investigation, by making the following statements to Defendant J. Ellis:

a) DP: I mean there's a victim selection process. **I don't know if that's what he did. Um ... I don't know why people do the things they do but obviously you didn't attract it on yourself.**

b) DP: So, you're open about the incident?

JE:     I'm very open about it. I obviously give no details. I - Sometimes people ask and I say I was sexually abused by a faculty member that previously worked at Laurel, but is no longer there.

DP:     **That's mature of you. <u>That's the truth</u> but it's not, you know, um, it's not naming anyone.**

c) DP: Yeah. And I can tell you that its- its- its, in the long run, not this situation itself but **<u>what your going through right now is going to make you stronger. Essentially, this is ... That's the only silver lining to this</u> but, going through what your going through now as a young lady coming into being a woman…this will benefit you.**

d) DP: *(speaking to Defendant J. Ellis)* You've never lied to me before.

e) DP: *(speaking to Defendant J. Ellis)* I've never known you to lie.

f) DP: (referring to *Defendant J. Ellis'* allegations) That's the truth.

88.     While Det. Page prepared numerous police reports, and several supplemental reports, Det. Page never referenced the second diagram drawn by Defendant J. Ellis in *any* of her reports or supplements.

89.     The second diagram drawn by Defendant J. Ellis during her second interview on April 21, 2016 was materially exculpatory and/or potentially useful evidence.

90.     The second diagram was materially inconsistent with Defendant J. Ellis' first diagram, the diagrams drawn by other witnesses, the statements of numerous other witnesses, Defendant J. Ellis' prior statements regarding the allegations against Plaintiff Newton, and inconsistent with documentary evidence which demonstrated that the "equipment room" was actually an art room, without any sports equipment, during the 2012-13 school year.

91.     At all times relevant, Det. Page knew that second diagram drawn by Defendant J. Ellis on April 21, 2016 was materially exculpatory and/or potentially useful evidence.

92.     Nevertheless, on April 21, 2016, or sometime thereafter, Det. Page, under color of state law, intentionally, willfully, maliciously, wantonly, grossly, recklessly, and with bad

faith, concealed/suppressed and/or destroyed the second diagram to prevent the second diagram's disclosure to Plaintiff's Newton's defense counsel.

93.     The second diagram was the only item missing from Det. Page's investigation case file and no other individual had access to Det. Page's investigation case file.

94.     Det. Page's conduct as alleged in ¶ 92, and as alleged throughout this Complaint, violated Plaintiff Newton's clearly established constitutional rights including Plaintiff Newton's right to due process of law and a fair trial and/or for the truth, and those rights enumerated under 42 U.S.C. § 1983.

### • The Grand Jury Indicts Plaintiff Newton on September 12, 2016 and the Immediate Media Frenzy

95.     The Grand Jurors of Cuyahoga County convened on September 12, 2016 to hear evidence concerning Defendant J. Ellis' allegations against Plaintiff Newton.

96.     Det. Page knew that due to Defendant J. Ellis' statements being irreconcilable with statements of numerous other witnesses, including Sally Hacala, Ann Klotz, Defendant J. Ellis' therapist, as well as the lack of any physical evidence to corroborate Defendant J. Ellis' allegations, Defendant J. Ellis' credibility was seriously undermined and did not provide Det. Page and/or the State of Ohio with probable cause to believe that Plaintiff Newton sexually assaulted Defendant J. Ellis.

97.     Nevertheless, Det. Page appeared as witnesses before the Cuyahoga County Grand Jury on September 12, 2016, despite knowing that she lacked probable cause to believe that Plaintiff Newton sexually abused Defendant J. Ellis.

98.     Det. Page's testimony to the grand jury contained material omissions, in furtherance of her malicious, bad faith goal to deprive Plaintiff Newton of his constitutional right to due process of law and a fair trial.  Her decision to withhold evidence of Defendant J.

Ellis' unreliability and/or exculpatory information was material because said information not only exculpated Plaintiff Newton, but also, clearly established that Defendant J. Ellis' allegations fail to sustain probable cause when there is apparent reason to question the person's reliability.

99.     On further information and belief, Det. Page deliberately and/or recklessly withheld material, exculpatory information from the grand jurors such as the inconsistent and contradictory statements and Diagram drawings that Defendant J. Ellis made during her two (2) interviews at the Shaker Heights Police Department, the October 15, 2014 therapy session, her meeting with Ann Klotz, and her meeting with Case Worker Dougherty, the ongoing confusion concerning Room G003, Defendant J. Ellis' surreptitious whispering during her first interview with Det. Page that detectives believed involved Room G003, and the statements of numerous other witnesses concerning the use of Room G003 as an art classroom.

100.     Additionally, Det. Page intentionally, willfully, deliberately and/or recklessly failed to inform the Grand Jury that (1) Defendant J. Ellis' produced two (2) diagrams of Laurel's equipment room/ gymnasium area, (2) that the second diagram was materially exculpatory and/or potentially useful evidence, (3) and that Det. Page, acting under color of state law, intentionally, willfully, maliciously, wantonly, grossly, recklessly, and with bad faith, concealed/suppressed and/or destroyed the second diagram to prevent the second diagram's disclosure to Plaintiff's Newton's defense counsel.

101.     Furthermore, Det. Page failed to advise the Grand Jurors of her personal bias in favor of Defendant J. Ellis and against Plaintiff Newton as well as the manner in which said bias caused Det. Page to investigate and report only those evidentiary leads and findings that

Det. Page believed would be beneficial to her, Defendant J. Ellis' and the State of Ohio's criminal case against Plaintiff Newton.

102.    Det. Page also deliberately and/or recklessly withheld information from the grand jurors regarding Defendant J. Ellis' various other issues, which reflected poorly on Defendant J. Ellis' credibility and character for truthfulness, despite knowing of said issues.

103.    Had the grand jurors known that there were several reasons to question the reliability and credibility of Defendant J. Ellis' allegations, as well as the reliability and credibility of Det. Page, and the neutrality/ integrity of Det. Page's investigation, they would not have indicted Plaintiff Newton.

104.    Reasonable law enforcement officers in the position of Det. Page would know that any credibility issues related to Defendant J. Ellis, and any issues concerning a biased, improper and unconstitutional law enforcement investigation, would be the type of information that grand jurors would want to know in making the decision on whether or not to return an indictment.

105.    Had this material information regarding Defendant J. Ellis and Det. Page's credibility been presented to the grand jury, the grand jurors would not have found probable cause to believe that the Plaintiff Newton sexually abused Defendant J. Ellis.

106.    On September 12, 2016, the Cuyahoga County Grand Jury indicted Plaintiff Newton in an eight (8) count Indictment charging him with: two (2) counts of Rape, in violation of R.C. § 2907.02(A)(2), felonies of the first degree, two (2) counts of Kidnapping, in violation of R.C. § 2905.01(A)(4), with Sexual Motivation Specifications, felonies of the first degree, two (2) counts of Gross Sexual Imposition, in violation of R.C. § 2907.05(A)(1), felonies of the fourth degree, and two (2) counts of Sexual Battery, in violation of R.C. §

2907.03(A)(7), felonies of the third degree. The offense dates in the indictment for Counts 1-4 were listed as on or about April 1, 2013 to April 30, 2013 (related to the first alleged incident), and on or about April 30, 2013 to May 31, 2013, for Counts 5-8 (related to the second alleged incident).

107.    On the same day of Plaintiff Newton's Indictment, as a result of Defendant J. Ellis' false allegations against Plaintiff Newton, several news and media outlets published articles reporting the Defendant J. Ellis' allegations of sexual assault against Plaintiff Newton and Plaintiff Newton's subsequent Indictment, including Channel 19 News, which published an article entitled "Former Shaker Heights girls school softball coach charged with rape," located at http://www.cleveland19.com/story/33077051/former-shaker-heights-girls-school-softball-coach-charged-with-rape and http://www.wtol.com/story/33077051/former-shaker-heights-girls-school-softball-coach-charged-with-rape. The article named Plaintiff Newton specifically as the individual accused of the sexual assaults.

108.    Also on September 12, 2016, as a result of Defendant J. Ellis' false allegations against Plaintiff Newton, Ms. Klotz, Headmistress of The Laurel School published and sent a letter to all Laurel School Families and Alumnae informing the community that Plaintiff Newton had been indicted by the Grand Jury for rape. Unlike the January 7, 2015 community letter from Laurel, the September 12, 2016 letter specifically named Plaintiff Newton as the individual Accused of sexual assault against a former student.

109.    On September 13, 2016, as a result of Defendant J. Ellis' false allegations against Plaintiff Newton, ABC News Channel 5 published an article entitled, "Former Laurel teacher indicted     for     rape     of     middle     school     student,"     located     at http://www.news5cleveland.com/news/local-news/cleveland-metro/former-laurel-teacher-

indicted-for-rape-of-middle-school-student. The article named Plaintiff Newton specifically as the individual accused of the sexual assaults and published a copy of Plaintiff Newton's indictment on its website.

110. On September 16, 2016, as a result of Defendant J. Ellis' false allegations against Plaintiff Newton, Cleveland.com published an article entitled, "Former Laurel School teacher accused of raping student on campus," located at http://www.cleveland.com/metro/index.ssf/2016/09/former_laurel_school_teacher_a.html. The article was also publically available on Cleveland.com's Facebook page, located at https://www.facebook.com/clevelandcom/posts/10155227982167501. The article named Plaintiff Newton specifically as the individual accused of the sexual assaults.

111. On September 23, 2016, as a result of Defendant J. Ellis' false allegations against Plaintiff Newton, Cleveland.com published an article entitled, "Former Laurel School coach sexually assaulted softball player, court records say," located at http://www.cleveland.com/metro/index.ssf/2016/09/former_laurel_teacher_sexually.html. The article named Plaintiff Newton specifically as the individual accused of the sexual assaults.

112. On September 26, 2016, Plaintiff Newton appeared in the Cuyahoga County Court of Common Pleas for his arraignment on the Indictment alongside Attorney Paul B. Daiker. Plaintiff Newton entered a plea of Not Guilty to all counts alleged in the Indictment.

113. The presiding arraignment room judge issued Plaintiff Newton a $10,000.00 cash, surety, or property bond, ordered Plaintiff Newton to be placed on Court Supervised Release through Pre-Trial Services (which required Plaintiff Newton to check in with Probation officer, random drug testing, and prevented Plaintiff Newton from leaving the State of Ohio

without prior Court authorization) and, due to the sexual nature of the offenses charged, the judge ordered Plaintiff Newton to undergo mandatory HIV testing.

114.    On the same date of Plaintiff Newton's arraignment, several news and media outlets published articles covering the arraignment, including Channel 19 News, which published an article entitled "Former Ohio softball coach pleads not guilty to sex charges." The article, which named Plaintiff Newton specifically and included a video of Plaintiff Newton's arraignment, is located at http://www.cleveland19.com/story/33199249/former-laurel-softball-coach-mark-newton-pleads-not-guilty-to-sex-charges.

115.    In addition, as a result of Defendant J. Ellis' false allegations against Plaintiff Newton, the Court Docket of the criminal proceedings against Plaintiff Newton in the Cuyahoga County Court of Common Pleas was also available publically on the Cuyahoga County Court of Common Pleas Case Information website.

- ***The Ellis Defendants' Defamatory $2,000,000.00 Demand Letter to The Laurel School***

116.    On November 4, 2016, the Ellis Defendants, by and through their Attorney John O'Neil, sent a twenty-six (26) pages demand letter to counsel for The Laurel School concerning Defendant J. Ellis' allegations against Plaintiff Newton (hereinafter "the demand letter").

117.    The Demand Letter stated, in relevant part:

"As you know, we represent Jacquelyn Ellis, who was sexually assaulted by her then softball coach while an 8th grade student at Laurel School….In that regard, he was a Laurel employee, and Laurel is responsible for his actions through the doctrine of respondeat superior…Mr. Newton sexually assaulted Jacquelyn on two (2) separate occasions while she was a middle school student at Laurel School….At this time, we demand $2,000,000.00 d to settle this matter pre-suit only."

118.     The Demand Letter constituted libel *pre se* against Plaintiff Newton as it constituted a false and defamatory statement about Plaintiff Newton (that he sexually assaulted Defendant J. Ellis), it was published to counsel for The Laurel School, the Cuyahoga County Prosecutor's Office, and other third parties to be proven at trial without privilege, the Ellis Defendants caused and/or ratified and/or encouraged the defamatory statements to be made and published intentionally, in bad faith and with actual malice, the demand letter accused Plaintiff Newton of committing a crime, and the defamatory statements reflected upon Plaintiff Newton's character in a manner that caused him to be ridiculed, hated, and/or held in contempt, and injured him in his trade or profession.

119.     The Demand letter and the statements caused special harm to Plaintiff Newton including but not limited to pain, suffering, mental anguish, and irreparable injury to reputation.

### • Additional Defamatory Statements Against Plaintiff Newton

120.     On March 29, 2017, Defendant J. Ellis met with Det. Page and Prosecutor Maggie Kane.

121.     During the March 29, 2017 informal meeting, which was not part of a judicial proceeding, Defendant J. Ellis re-stated her false allegations of sexual assault against Plaintiff Newton.

122.     Defendant J. Ellis' allegations of sexual assault against Plaintiff Newton, as she stated during the March 29, 2017 meeting with law enforcement, were made maliciously and in bad faith.

123.     Defendant J. Ellis' allegations of sexual assault against Plaintiff Newton, as she stated during the March 29, 2017 meeting with law enforcement, constituted slander *pre se*

against Plaintiff Newton as it constituted a false and defamatory statement about Plaintiff Newton (that he sexually assaulted Defendant J. Ellis), the statements were published to law enforcement, and other third parties to be proven at trial, Defendant J. Ellis individually, and/or in conspiracy with the Ellis Defendants, made and/or caused and/or ratified and/or encouraged the defamatory statements to be made and published intentionally, in bad faith and with actual malice, the statements accused Plaintiff Newton of committing a crime, and the defamatory statements reflected upon Plaintiff Newton's character in a manner that caused him to be ridiculed, hated, and/or held in contempt, and injured him in his trade or profession.

124.    Defendant J. Ellis' and Defendant A. Ellis' *per se* slanderous statements caused special harm to Plaintiff Newton including but not limited to pain, suffering, mental anguish, and irreparable injury to reputation.

*• Pre-Trial Evidentiary Issues Concerning Room G003 and the Second Diagram*

125.    While the specifics about Room G003 were always a "major issue", in the weeks immediately preceding trial, the issues concerning Defendant J. Ellis' statements and descriptions of the room were at an all time high.

126.    In early March of 2017, Plaintiff Newton filed his Notice of Alibi in which he Noticed the State of his two-fold Alibi—(1) "The Alleged Offenses Could Not Have Occurred on the Date(s) Identified by the State of Ohio and/or The Witnesses for the State of Ohio" and **"(2) The Alleged Offenses Could Not Have Occurred in the Room Described by and Drawn by the Alleged Victim".**

127.    Then, during trial preparation, defense counsel realized that it appeared that Defendant J. Ellis drew a second diagram of Room G003 and its contents during her April 21, 2016 second interview and that said second diagram was never disclosed to the defense.

128.    On Tuesday, April 4, 2017 Attorney Paul Daiker sent the following email to Prosecutor Maggie Kane, specifically requesting the disclosure of the Second Ellis Diagram, stating, "JE draws a new diagram in the second interview. Can you please get me a copy of that? Thanks! Paul."

129.    After receiving no response to the specific request for the disclosure of the Second Ellis Diagram, on April 9, 2017 at approximately 3:00p.m., Attorney Paul Daiker sent a "follow-up" email to Prosecutor Kane, in which the undersigned forwarded the previous April 4, 2017 email specifically requesting the disclosure of the Second Ellis Diagram.

130.    On April 10, 2017, Prosecutor Kane sent Attorney Paul Daiker the following email:

**From:** "Kane, Margaret" <mkane@prosecutor.cuyahogacounty.us>
**Date:** April 10, 2017 at 9:25:27 AM EDT
**To:** "Paul B. Daiker" <pbd@zukerman-law.com>
**Subject: RE: Second JE Diagram**

Hi Paul-Detective Page was out sick last week-she should be bringing this down early this week & I'll scan & send to you asap.  Thanks

131.    Again, having received no response from the Prosecuting Attorney, on April 22, 2017, Attorney Paul Daiker sent Prosecutor Kane the following email:

From: Paul B. Daiker <pbd@zukerman-law.com>
Sent: Saturday, April 22, 2017 2:30:54 PM
To: Kane, Margaret
Cc: Needham, Kelly; Larry Zukerman (lwz@zukerman-law.com); Adam Brown
Subject: Jacqueline's 2nd Diagram and Diary/Journal

Maggie: I am following up on our request for Jacqueline's second diagram, which we have still not received. She drew it on 4/21/16.

***

Thanks. Paul.

132. Thereafter, on April 24, 2017, Prosecutor Kane sent the following email in response to the repeated requests for the Second Ellis Diagram:

> From: "Kane, Margaret" <mkane@prosecutor.cuyahogacounty.us>
> Subject: Re: Jacqueline's 2nd Diagram and Diary/Journal
> Date: April 24, 2017 10:01:30 AM EDT
> To: "Paul B. Daiker" <pbd@zukerman-law.com>
>
> Hi Paul, thought I put this in earlier email. **Per Detective page there is not a second diagram.** She was referrrinf to the one she made in her first interview.*** Thanks

(emphasis added).

133. On Thursday, April 27, 2017, during an attorney conference, undersigned counsel met with Prosecutor Kane in the Jury Room of Courtroom 18 C of the Justice Center to discuss the criminal case against Plaintiff Newton, which was scheduled for trial on May 8, 2017.

134. During this attorney conference, Plaintiff Newton's defense counsel *again* requested that Prosecutor Kane disclose a copy of the Second Ellis Diagram, and reiterated to Prosecutor Kane that Defendant J. Ellis draws a second diagram during her second interview and based on Defendant J. Ellis' statements and hand movements observed on the recording, the second Diagram is *clearly* different than the First Diagram.

135. In accord with her previous email, Prosecutor Kane reiterated that "per Detective Page, there was only one Diagram" and that Defendant J. Ellis was only drawing on top of her first Diagram, a copy of which had already been disclosed to the defense.

136.    On Friday April 28, 2017, undersigned counsel received a telephone call from Shaker Heights Detective Walter Siegel in response to a defense subpoena concerning his availability to testify at Plaintiff Newton's trial.

137.    During this phone call undersigned counsel inquired of Det. Siegel about the Second Ellis Diagram.

138.    Det. Siegel advised the undersigned that Det. Page was the lead Detective on the case and that he would have to ask Det. Page about whether there existed a Second Ellis Diagram.

139.    While on the telephone with Defense Counsel, Det. Siegel sent a text message to Det. Page (who was at home at the time) inquiring about the Second Ellis Diagram. Det. Siegel then advised the undersigned that Det. Page stated that "If [the Second Ellis Diagram] exists, then it is in the file."

140.    Det. Siegel assured the undersigned that he would look through Det. Page's case file and send over any diagrams drawn by Defendant J. Ellis that he found. Det. Siegel also asked the undersigned to email to him a copy of the First Ellis Diagram that had already been provided to the Defense.

141.    In accord with Det. Siegel's request, the Attorney Paul Daiker sent Det. Siegel the following email with Defendant J. Ellis' first diagram (prepared on March 23, 2015) attached:

> From:  Paul B. Daiker <pbd@zukerman-law.com>
> To:     Walt Siegel <Walt.Siegel@shakeronline.com>
> Date:  Fri, Apr 28, 2017 at 12:47 PM
> Subject:  JE Diagram 1
>
> Detective Siegel:
>
> Attached is the only JE Diagram that we have.

142.    Following the telephone call with Defense counsel, Det. Siegel sent the following

email to Defense Counsel:

On Apr 28, 2017, at 1:25 PM, Walt Siegel wrote:

> One map drawn by Jackie which is tagged into evidence.  Should be item #013 on
> the property list of our report.  I can't look at it today because the property
> custodian won't be back until Monday.  I will double check it then.
> Walt

143.    On Monday May 1, 2017, Det. Siegel sent Plaintiff Newton's Defense counsel the

following email:

> **From:** Walt Siegel <Walt.Siegel@shakeronline.com>
> **Date:** May 1, 2017 at 7:59:36 AM EDT
> **To:** "PBD@ZUKERMAN-LAW.COM" <PBD@ZUKERMAN-LAW.COM>
> **Subject: DIAGRAM**
>
> The diagrams are the same.
>
> WALTER SIEGEL, Detective
>
> From: PoliceDBCopier@shakeronline.com
> [mailto:PoliceDBCopier@shakeronline.com]
> Sent: Monday, May 01, 2017 7:57 AM
> To: Walt Siegel
> Subject: Scanned File from PD DB Copier
>
> [ATTACHED COPY OF THE 1ST DIAGRAM]

144.    Attached to Det. Siegel's May 1, 2017 email was a copy of the First Ellis

Diagram, and nothing more.

   • ***Pre-Trial Witness Interviews at The Laurel School Concerning Room G003***

145.    On May 4, 2017, only three (3) days later, Attorney Paul Daiker and Attorney

Adam Brown of Plaintiff Newton's defense team, alongside Prosecutor Kane and Det. Page,

interviewed six (6) witnesses at The Laurel School.

146.     The interviews focused almost *exclusively* on Room G003 and the issue of whether *any* athletic equipment was stored in Room G003 during the spring of 2013, when Room G003 was being used as an art room, and when Defendant J. Ellis alleged the sexual assaults to have occurred.

147.     Even though Room G003 was a central debate in the criminal litigation from the onset of the prosecution, even though Det. Page had been asked only days before about the Second Ellis Diagram, and even though she was still actively involved in interviewing witnesses (alongside Defense counsel) whose interviews were scheduled for the sole purpose of discussing Room G003, Det. Page *never* revealed to the Defense the existence of a Second Ellis Diagram.

148.     As noted below, the existence of the Second Diagram was not actually confirmed until Defendant J. Ellis testified to drawing the Second Ellis Diagram during her trial testimony on cross-examination.

**• *The Criminal Trial of Plaintiff Newton- May 8, 2017***

149.     The matter proceeded to trial on May 8, 2017. From the beginning, the State's case was a "he said she said case with no physical evidence," "because of how long ago it happened."

150.     Thus, the State's case rested *squarely* on the credibility of Defendant J. Ellis.

151.     Also on May 8, 2017 as a result of Defendant J. Ellis' false allegations against Plaintiff Newton, Cleveland.com published an article entitled, "Case against former Laurel School softball coach accused of raping student hinges on testimony of victim," located at http://www.cleveland.com/metro/index.ssf/2017/05/case_against_former_laurel_sch_1.html.

The article named Plaintiff Newton specifically as the individual accused of the sexual assaults and included a picture of Plaintiff Newton.

152.    After Plaintiff Newton waived his right to a jury trial, the trial court granted Plaintiff Newton's previously filed Unopposed Motion for a Jury View and scheduled a viewing of Laurel to occur following opening statements.

153.    During opening statements, defense counsel spoke *extensively* about the issues concerning Room G003, about "how it was an art room and what was and was not in it"; Defense counsel even began to describe the issues with Room G003 as "the biggest" issues present in the case.

154.    Det. Page was present in the courtroom for opening statements.

155.    Thereafter, the trial court, accompanied by a sheriff's deputy, defense counsel, Plaintiff Newton, counsel for the State, and Det. Page traveled to and viewed those portions of Laurel set forth in Plaintiff Newton's Motion, including Room G003.

### • *Direct Examination of Jacquelyn Ellis*

156.    During her direct examination, Defendant J. Ellis testified that at the time of the alleged incidents in 2013, she retrieved equipment from "either the equipment room or the cage." Defendant J. Ellis testified that at the time of the alleged incidents, "bats, outdoor bases, and, like, nets you can hit into" were stored in "the cage".

157.    Further, Defendant J. Ellis testified that at the time of the alleged incidents, the "equipment room was also used as an art room during the day because there were renovations on the third floor where [the] art classes were."

158.    As to the contents of the "equipment room" during the alleged incidents, Defendant J. Ellis testified that "there were buckets of balls against the wall and then the rest

was just art stuff", however, Defendant J. Ellis claimed she could not remember what specific "art stuff" was contained inside "equipment room" at the time.

159.    When shown a picture taken from inside of Room G003, Defendant J. Ellis testified that during her eighth grade year (when both alleged incidents occurred) the buckets of softballs "were lined up against the wall" in "the area underneath [the] whiteboard."

160.    Defendant J. Ellis testified that other than the "dust on the floor," she could not remember anything else that was contained inside the equipment room during the alleged incidents.

161.    Defendant J. Ellis testified that during both alleged incidents, she "was standing against that wall facing the buckets, or the whiteboard…[f]acing the buckets, which would have been in the direction of the whiteboard…I was not facing the board but parallel with the board."

162.    Det. Page was present in the courtroom for Defendant J. Ellis' entire direct examination.

- *Cross Examination of Jacquelyn Ellis and Evidentiary Hearing Regarding the Second Diagram*

163.    The following day, May 9, 2017, as a result of Defendant J. Ellis' false allegations against Plaintiff Newton, Cleveland.com published an article entitled, "Victim allegedly raped by former softball coach takes the stand," located at http://www.wnem.com/story/35381761/victim-allegedly-raped-by-former-softball-coach-takes-the-stand. The article named Plaintiff Newton specifically as the individual accused of the sexual assaults and included a picture of Plaintiff Newton.

164.    That same day, during the cross-examination of Defendant J. Ellis, the trial court ordered Det. Page to leave the courtroom following an allegation that she was coaching Defendant J. Ellis' testimony.

165.    While Det. Page was outside the courtroom, Defendant J. Ellis admitted that she drew a second diagram of the equipment room/ Room G003 on April 21, 2016 during her second interview with Det. Page.

166.    Given the *enormity* of the issues concerning Room G003, defense counsel's *repeated* requests for the second diagram, and the false claim that there "was no second diagram," defense counsel immediately requested a sidebar and brought the discovery violation to the trial court's attention.

167.    After a sidebar conference, the trial court excused Defendant J. Ellis from the witness stand and began its inquiry into the discovery violation, which later revealed Det. Page's suppression of the exculpatory evidence, on the record.

168.    The prosecutor advised the trial court that Det. Page did not disclose the second diagram to the state.

169.    The trial court quickly convened an evidentiary hearing on the matter and ordered Det. Page back into the courtroom to be placed under oath and questioned about the second diagram.

170.    The trial court placed Det. Page under oath and permitted counsel to question Det. Page about her suppression of the second diagram.

171.    Det. Page initially testified that she advised the prosecutor that a second diagram existed approximately a week prior to the start of Plaintiff Newton's criminal trial.

172.     Det. Page later testified, under oath, that approximately a week prior to the start of Plaintiff Newton's criminal trial, she advised the prosecutor that she believed there was a second diagram, but she was not sure.

173.     Det. Page later testified, under oath, that approximately a week prior to the start of Plaintiff Newton's criminal trial, she advised the prosecutor that a second diagram existed but she lost it.

174.     Det. Page later admitted during her testimony that, in fact, she *never* advised the prosecutor, at any point, that there was a second diagram, even when specifically asked about the second diagram.

175.     Det. Page also testified that she knew the second diagram existed at least a week prior to the start of the criminal trial, she knew how important the second diagram was because she knew there were "huge", "major" issues with Room G003, and she knew the potentially exculpatory nature of the second diagram.

176.     Thereafter, Det. Page admitted during her testimony that she withheld the second diagram from the State and the defense, lied to the prosecutor, as well as her own colleague, Det. Walt Siegel about the existence of the second diagram, that the second diagram was the only document missing from her file and that she never included the second diagram in any of her numerous police reports or supplements.

177.     When questioned directly by the trial court, Det. Page realized she was caught in her lies, and admitted the following:

THE COURT:          So sometime in the last week you came to the realization there was a second diagram, correct?
THE WITNESS:        Yes.
THE COURT:          You did not, though, go tell Ms. Kane that, did you?
**THE WITNESS:        No.**
THE COURT:          And you do understand that that's potentially exculpatory information you

| | |
|---|---|
| | withheld from the state and the state has an obligation to turn over what they get? Do you understand that? |
| THE WITNESS: | Yes. |
| THE COURT: | So by you not telling her you interfered with that process? |
| THE WITNESS: | I didn't know. I didn't understand that, no. But now I understand |
| THE COURT: | How can you be a police officer and not understand that? |

178.     Notwithstanding her express statements to the contrary, and over a decade in law enforcement, Det. Page falsely testified to the trial court that she did not understand the duties of reciprocal discovery in criminal cases and the serious constitutional implications of breaching said duty.

179.     Det. Page's material, false testimony before the trial court, made knowingly and with the intent to deceive and conceal her bad faith, malicious, intentional violations of Plaintiff Newton's constitutional rights, constituted the crime of perjury.

180.     As to the content of the second diagram, Det. Page admitted that while she heard Defendant J. Ellis testify on direct that the buckets of softballs "were only along the side of the wall" within room G003, during the video of her second interview, Defendant J. Ellis "drew[] them all over the place" on the second diagram.

181.     In addition to admitting her lies to the prosecutor and Det. Siegel during the evidentiary hearing, Det. Page also *proudly* admitted that she advised Defendant J. Ellis that she was her "advocate" during her interview of Defendant J. Ellis, stating "that's correct…I'm not denying that at all."

**• *Defense's Motion to Dismiss, Reserved Ruling, Continued Cross of Defendant J. Ellis, Testimony of Det. Siegel and Det. Page***

182.     Both during and after the evidentiary hearing, the defense made a motion to dismiss the indictment based on the destruction of evidence arguing that the second diagram was materially exculpatory.

183.     After hearing argument the trial court reserved its ruling on the motion, ordered the trial to continue and ultimately, ordered the State, over its objection, to call Det. Page to testify out of order. Thereafter, Defendant J. Ellis returned to the courtroom and her cross-examination continued.

184.     Defendant J. Ellis further testified that the locations of the balls within the room was "a big question," that she only drew the locations of the balls on the second diagram, and the video of her second interview where she draws the second diagram is "too far away" to see exactly where she drew the balls inside the room.

185.     Defendant J. Ellis *repeatedly* denied (even after watching the video) that she drew six (6) different circles throughout the room where the balls could have, stating, "incorrect, I did not draw six…I see myself draw three (3) circles." Later, Defendant J. Ellis admitted to drawing an additional "big circle where the buckets of balls are," but admitted that from the video, it cannot be determined where she drew the big circle on the diagram.

186.      Defendant J. Ellis agreed that the court and counsel were "kind of in a quandary" because "we can't tell what [she] drew," Defendant J. Ellis further testified, "I remember what I drew," and admitted that the court is just going to have to "take her word for it," as it relates to where she drew the location of the balls.

187.     Later, however, when confronted about her shifting statements concerning Room G003 and the alleged assaults, Defendant J. Ellis claimed that her story did not change, but rather it just "lost detail" because she suffers from memory loss.

188.     In addition, Defendant J. Ellis admitted during cross-examination that she is a "pretty good liar."

189.     Defendant J. Ellis admitted in her testimony that, based on what she told Det. Page about when the sexual assaults allegedly occurred, the alleged sexual assaults by Plaintiff Newton against her could not have occurred.

**• *Testimony of Det. Walter Siegel***

190.     During Det. Walter Siegel's testimony, defense counsel reviewed the video of the April 21, 2016 second interview of Defendant J. Ellis extensively with Det. Siegel.

191.      As it relates to the second diagram, Det. Siegel admitted that based on the video, Defendant J. Ellis can be observed drawing on the second diagram "locations throughout the room as to where she says the balls could be."

192.     However, Det. Siegel further acknowledged that from the video, the exact locations where Defendant J. Ellis drew the balls throughout the room in the second diagram cannot be determined.

193.     Det. Siegel also confirmed through his testimony that "until yesterday" (May 9, 2017) he did not know that a second diagram existed because "[Det. Page] told [him] that if there was another diagram, it would be in the case file… [and]…as far as she knew, there was only one diagram."

**• *Testimony of Det. Page, Renewed Motion to Dismiss & Dismissal***

194.     On direct examination, Det. Jessica Page discussed her background, experience, and the general steps she took throughout her investigation into Defendant J. Ellis allegations against Plaintiff Newton.

195.     Det. Page also attempted to "explain-away", her biased and appalling statements and assurances to Defendant J. Ellis during her interviews, as well as her bad faith suppression of the second diagram. Det. Page testified that by advising Defendant J. Ellis that

she was her "advocate," what she meant was that she "was there if [Defendant J. Ellis] needed help or services of any kind."

196.    The trial court found this attempted explanation to be "illogical and equally disturbing," given Det. Page's admission to being biased and lacking neutrality.

197.    With respect to the second diagram, Det. Page again attempted to explain that she only recently learned there were was a second diagram and claimed that she did not know what happened to it.

198.    Following her direct examination, the defense did not ask Det. Page any questions on cross-examination, and Det. Page exited the courtroom.

199.    After the direct testimony of Det. Page, the trial court heard further argument as to the defense's Motion to Dismiss.

200.    The defense reiterated its initial argument that the second diagram was materially exculpatory and impeachment evidence, that the good or bad faith of the non-disclosure was therefore irrelevant, and that dismissal with prejudice was the only appropriate sanction for the violations. Additionally, the defense argued, in the alternative, that were the court to determine the second diagram was only potentially useful, as conceded by the State, that Det. Page suppressed/concealed/ destroyed the second diagram in bad faith.

201.    The State argued that the second diagram was not materially exculpatory, but only "potentially useful" evidence and that the defense failed to prove that Det. Page acted in bad faith.

202.    Thereafter, in a twelve (12) page opinion, the trial court granted the defense's Motion to Dismiss and dismissed the case with prejudice, finding that the second diagram was materially exculpatory, that Det. Page acted in bad faith by

concealing/withholding/suppressing the second diagram, and that as a result, Det. Page violated the criminal rules of discovery, her duties as a law enforcement officer, and most importantly, Plaintiff Newton's constitutional rights to due process of law and a fair trial.

• ***Constitutional Violations Resulting from Shaker Heights Police Department/ City of Shaker Heights Illegal Patterns, Policies, Practices and Customs***

203.     Plaintiffs hereby reaffirm, reiterate, and incorporate by reference each and every allegation set forth throughout this Complaint as if fully set forth herein.

204.     As established in greater detail in the paragraphs below, at all times relevant to the claims alleged herein, the SHPD/ City of Shaker Heights had unwritten, yet clear and persistent, illegal patterns, policies, customs and/or practices of (1) withholding exculpatory evidence, (2) failing to supervise its officers and Detectives to prevent constitutional violations regarding the identification, collection and disclosure of evidence, (3) conducting biased, guilt presumptive investigations, and (4) systemic tolerance, acquiescence and inaction in the face of known federal constitutional violations. (hereinafter "the unconstitutional Policies/Customs").

205.     Further, the Senior SHPD Defendants had actual knowledge of the unconstitutional Policies/Customs and the City of Shaker Heights, through the Senior SHPD Defendants, had constructive notice of said unconstitutional Policies/Customs.

206.     The Senior SHPD Defendants and the City's tacit approval of the acts and omissions forming the unconstitutional Policies/Customs such that their deliberate indifference in their failure to act amounted to an official policy of inaction.

207.     The Senior SHPD Defendants and the City's unconstitutional Policies/Customs were the "moving force" or direct causal link to the constitutional deprivations that Plaintiff Newton suffered in this case.

- ***Vaughn v. City of Shaker Heights**, et al, Case No.: 1:10-cv-00609, (N.D. Dist. Ohio 2010)*

208.    Unfortunately, Plaintiff Newton's case is neither an isolated incident nor the first time a Shaker Heights Police Detective has been accused of withholding exculpatory evidence from criminal defendants in violation of clearly established constitutional rights.

209.    In *Vaughn v. City of Shaker Heights*, et al, Case No.: 1:10-cv-00609, (N.D. Dist. Ohio 2010), Plaintiff James Vaughn III filed suit against the City of Shaker Heights, SHPD Detective Douglas Hyams and others alleging that SHPD Detective Douglas Hyams, who investigated Vaughn for the alleged rape of a nine (9) year old child, violated Vaughn's federal constitutional rights by failing to disclose exculpatory evidence to Vaughn's counsel, resulting in Vaughn's wrongful indictment and conviction at trial. *Id.* at Doc. 126, p. 7.

210.    Subsequent to his conviction, Vaughn obtained a new defense team who thereafter filed a Motion for New Trial. The Motion was based (in part) on information obtained by an investigator who found and interviewed a DCFS worker, Ms. Stout, who testified that the alleged child victim, "M.M.", "did not disclose penetration" to her during an assessment, that she "really did not see in this situation that any penetration occurred," and confirmed that, after her interview of M.M., she was confident that M.M. 'was not penetrated in any form.'" Ms. Stout also testified that she told Detective Hyams that M.M. did not disclose penetration. *Id*

211.    Cuyahoga County Common Pleas Judge David Matia granted Vaughn a new trial, where a jury subsequently acquitted Vaughn of all charges.

212.    In his subsequent civil lawsuit, Vaughn alleged, among other claims, a Brady claim under § 1983 based on Detective Hyams's alleged failure to disclose exculpatory and impeachment evidence, to wit: that Ms. Stout had told him that her assessment of M.M. had

led her to conclude that Vaughan had never penetrated M.M" and that Det. Hyams "failed to disclose that he learned from Ms. Stout that M.M. never told her (Stout) that Vaughan had committed any act that supported the charge of rape, for which Vaughan was indicted and wrongfully convicted." *Id.* at Doc. 126, p. 7.

213.    During the civil litigation in *Vaughn v. City of Shaker Heights*, Vaughn's counsel discovered a Performance Evaluation for SHPD Douglas Hyams, prepared by then SHPD Lieutenant Jeff DeMuth (now Chief DeMuth and a named Defendant herein). DeMuth's review and evaluation of Det. Hyams provided in relevant part:

> Detective Hyams does an adequate job with the investigations he is assigned. At times he fails to document important investigative steps he completed during an individual investigation. A greater commitment to detailed documentation of investigative steps should be a goal…
>
> The detailed composition of investigative supplemental reports is an area Det. Hyams need to improve. Numerous reports throughout the year have been returned due to mistakes or omissions of important details relevant [to] an investigation. Many times, Det. Hyams has taken the necessary investigative steps but has failed to memorialize them on his investigative supplement….Det. Hyams report writing does need close supervision and is an area he needs to improve upon.

214.    During Det. Hyams March 28, 2014 deposition, Det. Hyams admitted that the Vaughn case was the very first time that he testified before a grand jury in a case involving an alleged sexual abuse. *Id*., Doc. 93-1, at p. 29.

215.    Also during his deposition, Det. Hyams admitted that at the time of his investigation into Vaughn, he did not have experience in conducting interviews of alleged child victims of sexual assault, however there were no other SHPD Detectives that concentrated on alleged sexual abuse cases, such as the case against Vaughn, other then him. *Id*., Doc. 93-1, at p. 48, 76.

216.    Further, when asked by Vaughn's counsel the following question: "During your tenure as a Shaker Heights police officer and in the Vaughn case, did you have a duty to

reveal exculpatory evidence to the prosecutor?," Det. Hyams dodged the question, and responded stating, "I don't have a -- first of all, I don't determine what's exculpatory evidence. That's not my position. That's not my responsibility. I'm a police officer. That's up to the prosecutor…my duty is to investigate, report and turn my complete case file over"…and "I really don't get involved in exculpatory evidence at all." *Id.*, Doc. 93-1, at p. 71, 83-84.

217.    Additionally, with respect to the disclosure of evidence to the prosecutor, Det. Hyams testified that a prosecutor cannot receive that which is not in [a Detective's case file], which is why it is important to "put everything in your case file," and that if there's an absence of information in a Detective's case file, "then the information probably doesn't exist." *Id.*, Doc. 93-1, at p. 116.

218.    Finally, Det. Hyams admitted during his deposition that a criminal trial of an accused, from whom exculpatory evidence has been withheld, "may not be a fair trial." *Id.*, Doc. 93-1, at p. 83-84.

219.    In an April 14, 2015 opinion ruling on the Defendants' Motions for Summary Judgments, the Court concluded "that there is sufficient evidence on the record to support the claim that Det. Hyams possessed exculpatory information" and that "the exculpatory value of the evidence would have been apparent to Det. Hyams." *Id.* at Doc. 126, p. 8.

220.    However, the Court further determined there was no Brady violation because Mr. Vaughan was aware of the "essential facts" that would have allowed him to obtain the exculpatory information at issue and that the exculpatory information was not within the exclusive control of the government. *Id.* at Doc. 126, p. 8-9.

**• *Det. Page's 2015 Shaker Heights Police Department Detective Performance Report***

221.    In December 2015, nine (9) months after Defendant Page's supervisor, Defendant Lamielle, assigned Defendant Page to investigate Plaintiff Newton's case on her own and without a partner, Defendant Lamielle, prepared Defendant Page's 2015 SHPD Detective Performance Report.

222.    Defendant Lamielle, Defendant Cole, Defendant DeMuth *and* Defendant Page herself, reviewed, signed and approved Defendant Page's 2015 SHPD Detective Performance Report, that Defendant Lamielle, prepared.

223.    At all times relevant, as senior/ supervisory SHPD officers, Defendant Lamielle, Defendant Cole and Defendant DeMuth, were responsible for supervising Det. Page in the course of her duties as a SHPD juvenile sex crimes detective.

224.    Defendant Lamielle Performance Report of Defendant Page provided in relevant part the following:

> …Jessica must use caution in the future to avoid allowing her tenacious 'can do attitude' to get ahead of an effort to judiciously and reasonably think about potential pitfalls with an investigation.

225.    Defendant Lamielle went on to describe Defendant Page's Problem Solving Skills in the context of an alleged case of sexual assault against a two-year old that was assigned to Defendant Page. During that case, Defendant Lamielle observed that Defendant Page had and "obvious emotional desire to identify and prosecute a suspect," and suggested in the Performance Review that **Defendant Page was not yet "a professional fact finder," but rather "someone who makes subjective decisions to put someone in jail."** (emphasis added).

226.    Notwithstanding the above, Defendant Lamielle marked the "Exceeds Standards" box on Defendant Page's annual review for problem solving.

227.    Like the fact-documenting issues present in Det. Hyams' reports prior to Det. Hyams withholding the exculpatory evidence in *Vaughn*, Defendant Lamielle noted that, with respect to Defendant Page's 'Quality of Work', "[Defendant Page]…struggled with documenting complex issues…[and] documenting in her report the details that would fully outline the entire scope of criminal behavior so a prosecutor could adequately complete a multi-count indictment or charge."

228.    As for the "Judgment" category, Defendant Lamielle noted that "Jessica has occasionally had a tendency to become emotionally attached to an issue…it has occasionally slowed her ability to recognize an issue or comment that is 'right in front of her face.'" Defendant Lamielle continued by noting, "I commend [Defendant Page] for having compassion and concern for her fellow man. She must guard against allowing that compassion to cloud her judgment though when dealing with people who have great reason to lie to her."

229.    Notwithstanding the above, and the obvious risks of constitutional violations resulting, such as those Plaintiff Newton suffered as alleged herein, from having Defendant Page investigate child sex crimes on her own, as such risks were actually known to Defendant Lamielle, Defendant Cole and Defendant DeMuth, and constructively known to the City of Shaker Heights, Defendant Lamielle, Defendant Cole *and* Defendant DeMuth reviewed, signed and approved Defendant Page's 2015 SHPD Detective Performance Report, continued to permit Defendant Page to investigate Plaintiff Newton's case on her own, and as of September 30, 2016, **nobody reviewed** Det. Page's work/ investigation into Plaintiff

Newton, as demonstrated by the "Case Reviewed By & Date" portion of Defendant Page's Offense/Incident Report Detail, which provides:

> Detective Assigned: JPage Date Case Assigned: 04/03/2015
> Case Assigned By: Sgt. Lamielle Date of Second Contact: 04/03/2015
> Supervisory Case Reviews/ Dates: [BLANK]
> Date Case Cleared/ Inactivated: [BLANK]
> Case Reviewed By & Date:  **OfficerID: Jpage**

• *Det. Walter Siegel's Tolerance, Acquiescence, Inaction and Unconstitutional Failure to Intervene in the Face of Known Federal Constitutional Violations*

230.    As set forth below, Det. Siegel knew that Defendant Page's investigation into Plaintiff Newton constituted an ongoing violation of Plaintiff Newton's constitutional rights to due process and, if Defendant Page continued to investigate Plaintiff Newton in a manner consistent with her statements made to Defendant J. Ellis during the interviews, then further violations of Plaintiff Newton's constitutional rights would result, yet he failed to intervene to prevent the constitutional violations.

231.    Furthermore, Det. Walter Siegel's tolerance, acquiescence and unconstitutional failure to intervene inaction and failure to intervene in the face of known federal Constitutional violations by Defendant Page against Plaintiff Newton further evidences the City's and SHPD Illegal Policies/ Customs, as set forth herein.

232.    When Det. Siegel reviewed the first interview that Defendant Page conducted with Defendant J. Ellis, he became aware of Defendant Page's statements to Defendant J. Ellis, as set forth in ¶ 56 a-g, which evidenced Defendant Page's unethical, unprofessional, unconstitutional, willful, spiteful, bad faith, and malicious bias against Plaintiff Newton, her lack of neutrality and immediate personal attachment to Defendant J. Ellis, and her bad faith objective and motivation to convict Plaintiff Newton or ruin his reputation, regardless of the information or evidence.

233.    Det. Siegel knew that if Defendant Page were to conduct her investigation into Plaintiff Newton, in a manner consistent with her statements made to Defendant J. Ellis during the first interview, then continuous violations of Plaintiff Newton's constitutional rights, of the type actually suffered by Plaintiff Newton, would result.

234.    In addition, as noted throughout ¶¶ 79 through 87 above, Det. Siegel was present with Defendant Page during her second interview of Defendant J. Ellis on April 21, 2016.

235.    Notably, Det. Siegel was present when Defendant Page made many of the statements to Defendant J. Ellis during the April 21, 2016 interview (*see* ¶¶ 79 through 87 above)—including but not limited to Defendant Page's statements to Defendant J. Ellis, "I've never known you to lie," "That's the truth" (*referring to Defendant J. Ellis' allegations*), and "**if this goes to trial the other attorney is going to have access to these interviews between… they are going to have access to everything…and what I don't want is for that attorney to see this and go, "why is this person talking into their sleeve?" <u>Cause it looks bad.</u>**" (*referring to a tape of Defendant J. Ellis' surreptitious whispering*)—all of which evidenced Defendant Page's *continued* unethical, unprofessional, unconstitutional, willful, spiteful, bad faith, and malicious bias against Plaintiff Newton, her lack of neutrality and immediate personal attachment to Defendant J. Ellis, and her bad faith objective and motivation to convict Plaintiff Newton or ruin his reputation, regardless of the information or evidence.

236.    Furthermore, Det. Siegel was present during the April 21, 2016 interview when Defendant J. Ellis drew the second diagram.

237.    Given that Det. Siegel previously reviewed the video of Defendant J. Ellis' March 23, 2015 first interview in which Defendant J. Ellis prepared the *first* diagram, Det.

Siegel *knew* that the diagram Defendant J. Ellis prepared during the April 21, 2016 interview was **a second diagram**.

238.     As set forth above, Prior to Plaintiff Newton's criminal trial, Det. Siegel exchanged a series of phone calls and emails with Plaintiff Newton's defense counsel, who specifically requested Det. Siegel to provide the second diagram. When Det. Siegel reviewed the evidence in SHPD's possession, he determined that Defendant Page only submitted Defendant Ellis' first (1) diagram into the SHPD evidence locker.

239.     Det. Siegel also reviewed the tape of Defendant J. Ellis' April 21, 2016 second interview (during which Det. Siegel was present) pursuant to his discussions with Plaintiff Newton's defense counsel, as alleged throughout ¶¶ 136-44, above.

240.     Nevertheless, despite *knowing* that Defendant J. Ellis prepared a second diagram, Det. Siegel simply advised Newton's defense counsel that there was only one (1) diagram in evidence and the diagram that was disclosed to the defense (the first diagram) was the same diagram in the SHPD's evidence locker. (See ¶¶ 136-44, above).

241.     Det. Siegel knew that if Defendant Page continued her investigation into Plaintiff Newton, in a manner consistent with her statements made to Defendant J. Ellis during the first *and second interviews*, then continuous violations of Plaintiff Newton's constitutional rights, of the type actually suffered by Plaintiff Newton, would result.

242.     During Plaintiff Newton's criminal trial, Det. Siegel admitted on cross examination that it is not his job as a detective to take the side of a complaining witness, he is not a team with a complaining witness, that he would never advise a complaining witness "I'll do anything you want me to do," that he would never state to a complaining witness, "You've never lied to me before," (even responding to the question "How would I know?")

and he would never talk to a complaining witness about whether a suspect "should be killed"—the exact statements and conduct that he *knew* that Defendant Page displayed to Defendant J. Ellis based on his review of the first and second interviews of Defendant J. Ellis, and his presence during the April 21, 2016 second interview of Defendant J. Ellis.

243.     Det. Siegel had a duty to, and could have, acted and/or intervened to prevent Defendant Page's unconstitutional investigation, advocacy for Defendant J. Ellis and bias against Plaintiff Newton, Defendant Page's continuous violations of Plaintiff Newton's constitutional rights, and ultimately, prevented Defendant Page's suppression of the materially exculpatory second diagram, and his failure to do so violated Plaintiff Newton's constitutional rights.

244.     Finally, as noted, Det. Walter Siegel's tolerance, acquiescence and unconstitutional inaction, deliberate indifference and failure to intervene in the face of known federal Constitutional violations by Defendant Page against Plaintiff Newton further evidences the City's and SHPD Illegal Policies/ Customs, as set forth herein.

**State of Ohio v. Michael Ferricci**, Case No.: 16-CR-607929-A

245.     In addition to Plaintiff Newton's case, recently learned facts indicate that Defendant Page's unconstitutional conduct and investigative advocacy, (which stemmed from the City's and SHPD's unconstitutional policies/ customs, and of which the City and SHPD Defendants were aware, though to which they were deliberately indifferent) occurred throughout her other investigations as a SHPD Juvenile Sex Crimes Detective.

246.     On November 17, 2017 Cleveland.com published an article entitled "Mistrial declared in case of Shaker Heights church daycare employee accused of child rape." (hereinafter "the Ferricci article").

247.    The Ferricci article highlighted the mistrial that Cuyahoga County Common Pleas Judge Kathleen Ann Sutula declared in the case of *State of Ohio v. Michael Ferricci*, Case No.: 16-CR-607929-A, that same day.

248.    Specifically, the Ferricci article contained the following information with respect to Defendant Det. Jessica Page:

> Detectives interviewed Ferricci for more than three hours, and he eventually confessed, court records say.
>
> Ferricci's lawyers, Marcus Sidoti and Mark Marein, argued at trial that Shaker Heights police coerced Ferricci's confession, the boy's statements contained several discrepancies and a detective who worked the case, Jessica Page, left evidence out of her police report that DNA found in a pair of the boy's underpants did not match Ferricci's.

249.    The date of offense in the *Ferricci* matter is listed on the Cuyahoga County Court of Common Pleas Docket as "June 27, 2016," and the Grand Jury Indicted *Ferricci* on July 15, 2016.

250.    Upon belief, Defendant Page alone and/or alongside other SHPD officers violated Mr. Ferricci's constitutional right against compelled self-incrimination when they coerced Mr. Ferricci to confess to the crime of child rape.

251.    Furthermore, upon belief, in the *Ferricci* case, Defendant Page engaged in unconstitutionally and sought to suppress and/or withhold exculpatory information, such as the DNA found in the alleged child victim's underpants that did not match Mr. Ferricci's DNA.

252.    Upon belief, Defendant Page's unconstitutional conduct in *Ferricci* occurred at or around the same time period of the ongoing constitutional violations committed by Defendant Page in Plaintiff Newton's case, and further demonstrates the ongoing and systemic unconstitutional policies/ customs of the SHPD and the City of Shaker Heights.

## COUNT ONE

**Bad Faith Suppression/ Concealment/ Destruction/Nondisclosure of Evidence: Violation of Due Process Pursuant to 42 U.S.C. § 1983**

253.    Plaintiffs hereby reaffirm, reiterate, and incorporate by reference each and every allegation set forth throughout this Complaint as if fully set forth herein.

254.    Plaintiff Newton as a citizen of the United States and of the State of Ohio is accorded many rights, freedoms, and benefits under the United States Constitution and the Ohio Constitution.

255.    At all times, Plaintiff Newton had a clearly established right to due process of law and to a fair criminal trial pursuant to the Ohio Constitution and the Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

256.    The due process clauses of the Ohio and Federal Constitutions, as well as Federal law, Ohio law, and the Ohio Rules of Criminal Procedure, require law enforcement officers to disclose to the Prosecuting Attorney and/or the defense any and all evidence obtained during criminal investigations and prosecutions against an accused.

257.    The actions and omissions of the SH Defendants as set forth herein above constitute state action under 42 U.S.C. § 1983.

258.    At all times, Defendant Page, as a law enforcement officer for the SHPD, knew that the due process clauses of the Ohio and Federal Constitutions, as well as Federal law, Ohio law, and the Ohio Rules of Criminal Procedure, required her to disclose to the Prosecuting Attorney and/or the defense any and all evidence obtained during her investigation into Defendant J. Ellis' allegations against Plaintiff Newton.

259.    Defendant Page, acting under color of state law, acted intentionally, and/or with deliberate indifference to, and/or with reckless disregard for, Plaintiff's Newton's clearly

established constitutional rights to due process of law and a fair trial and/or for the truth, by concealing/suppressing and/or destroying the second diagram from evidence at Plaintiff's Newton's criminal trial and withholding the second diagram from the prosecutor, to prevent the second diagram's disclosure to Plaintiff's Newton's defense counsel.

260.     Defendant Page's conduct, as set forth under ¶ 259, was in bad faith.

261.     Defendant Page's conduct, as set forth under ¶ 259 violated Plaintiff Newton's clearly established constitutional rights including Plaintiff Newton's right to due process of law and a fair trial and/or for the truth, and those rights enumerated under 42 U.S.C. § 1983.

262.     Defendant Page, under color of state law, intentionally, willfully, maliciously, wantonly, grossly, recklessly, and with bad faith, violated Plaintiff Newton's state and federal constitutional rights by intentionally misleading her colleague, Det. Walter Siegel, and Cuyahoga County Assistant Prosecutor Margaret Kane, into believing that the second diagram did not exist, to prevent the second diagram's disclosure to Plaintiff's Newton's defense counsel during the criminal trial.

263.     In violating Plaintiff Newton's rights as set forth above, Defendant Page acted intentionally, willfully, maliciously, and with deliberate and/or reckless indifference/ disregard for Plaintiff Newton's clearly established constitutional rights, such that punitive damages should be imposed in an amount commensurate with the wrongful acts alleged herein.

264.     As a direct and proximate result of Defendant Page's conduct as set forth under ¶ 259, Plaintiff Newton was deprived of his clearly established state and federal

constitutional rights to due process of law and a fair trial and/or for the truth, and suffered damages including, but not limited to extreme emotional and psychological damage, pain and suffering, lost income and/or employment, and may incur more damage and/or loss in the future.

**COUNT TWO:**
**Supervisor Liability: Violation of 42 U.S.C. § 1983**

265.　　　Plaintiffs hereby reaffirm, reiterate, and incorporate by reference each and every allegation set forth throughout this Complaint as if fully set forth herein.

266.　　　Defendants City of Shaker Heights, the SH Defendants and/or John and/or Jane Does 1-5 had supervisory roles over Defendant Jessica Page.

267.　　　On information and belief, the SH Defendants directly participated in and/or directed, ordered, authorized, approved, encouraged and/or knowingly acquiesced to specific incidents of Defendant Page's misconduct in the within matter, to wit: Defendant Page's unconstitutional conduct concerning the bad faith, malicious suppression of the second diagram, as outlined above and throughout this Complaint, failing to question and/or further investigate Defendant J. Ellis' allegations of sexual abuse even when there are concerns regarding the veracity of the allegations, making material omissions in police reports and supplements, intentionally making material omissions during her testimony before the Grand Jury, knowingly participating in the continued prosecution of Plaintiff Newton without probable cause , and/or in not timely turning over exculpatory information gathered during an investigation, and/or in some other way directly participated in said conduct, or directed, ordered, authorized, approved, and/or knowingly acquiesced in the unconstitutional conduct of Defendant Page, all of which amounted to deliberate indifference to Plaintiff Newton's constitutional rights and which specifically

resulted in the deprivation of Plaintiff Newton's state and federal constitutional rights to due process of law and a fair trial pursuant to the Ohio Constitution and the Fifth, Sixth and Fourteenth Amendment to the United States Constitution.

268.    On information and belief, the SH Defendants subjected Plaintiff Newton to the deprivation of constitutional rights as set forth herein.

269.    As a direct and proximate result of the SH Defendants' actions or omissions as set forth throughout, Plaintiff Newton suffered damages and injuries.

**COUNT THREE:**
**Failure to Train and/or Supervise Employees:  Violation of 42 U.S.C. § 1983**

270.    Plaintiffs hereby reaffirm, reiterate, and incorporate by reference each and every allegation set forth throughout this Complaint as if fully set forth herein.

271.    Defendant City of Shaker Heights and the SHPD Defendants were responsible for the training and/or supervision of its law enforcement officers, including but not limited to Defendant Jessica Page.

272.    The training and/or supervision of Defendant Page was and/or were inadequate for the duties performed by Defendant Page in her capacity as a Detective with the Shaker Heights Police Department.

273.    The inadequacy of the training and/or supervision of Defendant Page as it relates to (a) inexperienced detectives leading sexual assault investigations, (b) investigations of sexual assault when a complaining witness makes inconsistent and/or conflicting statements and/or implausible statements, (c) collecting and maintaining all evidence during criminal investigations, (d) preparing reports and/or supplemental reports for review and reliance by prosecutors in making probable cause determinations to justify the presentment of charges to the Grand Jury, (e) continuing the criminal prosecution of an

individual without probable cause, (f) the timely disclosure of material, exculpatory information, (g) the constitutional violations and criminal consequences stemming from withholding material evidence for the purpose of preventing its disclosure to the defense, to wrongfully secure a criminal conviction, (h) where there was no supervisor oversight during the investigation, was the result of the SH Defendants' policy and/or custom of deliberate indifference to the constitutional rights, privileges, and/or immunities of citizens of the United States and/or community at large, specifically including but not limited to, any and all statutory and/or constitutional rights of Plaintiff Newton, which were violated by the SH Defendants.

274.    The inadequacy of the training and/or supervision of Defendant Page was closely related to, or actually caused, the injury to Plaintiff Newton.

275.    As a result of this deliberate indifference to Plaintiff's rights, Plaintiff Newton suffered general and special damages as alleged in this Complaint and is entitled to relief under 42 U.S.C. § 1983.

## COUNT FOUR
### Malicious Prosecution: Violation of 42 U.S.C. § 1983

276.    Plaintiffs hereby reaffirm, reiterate, and incorporate by reference each and every allegation set forth throughout this Complaint as if fully set forth herein.

277.    Within those constitutional rights accorded to Plaintiff are, *inter alia*, the right to be free from a deprivation of liberty without due process, and the right to due process in general, as guaranteed to him under the Fourth and Fourteenth Amendments to the United States Constitution.

278.    The SH Defendants, acting under the color of state law, intentionally, willfully, wantonly, grossly, and/or recklessly violated Plaintiff Newton's constitutional rights,

including the right to due process and those rights enumerated under 42 U.S.C. § 1983, by maliciously instituting and/or actively participating in the decision to prosecute Plaintiff Newton and/or continuing the prosecution of Plaintiff Newton, knowing that there was no probable cause to believe that he committed the offenses alleged by Defendant J. Ellis.

279.    As a consequence of the legal proceedings and/or prosecution brought against him through the SH Defendants' participation, Plaintiff Newton suffered deprivations of liberty, apart from his initial seizure, including but not limited to being required to post a $10,000.00 bond to secure his own pre-trial release, being placed on Court Supervised Release (CSR) as a condition of his bond, being required to check in with a pre-trial services officer weekly and/or bi-weekly, being subjected to drug screens through the CSR program, ordered to undergo mandatory HIV testing, and being prohibited from leaving the State of Ohio without prior court authorization, from September 26, 2016 through May 11, 2017.

280.    After Plaintiff Newton was indicted on September 12, 2016, Det. Page continued to learn of exculpatory information that supported Plaintiff Newton's claims of innocence and which rendered Defendant J. Ellis' allegations even more implausible, illogical, highly unlikely to have occurred, and lacking probable cause, including but not limited to the following evidence: (a) the statements of nearly ten (10) witnesses regarding Room G003 being an art room without any sports equipment inside during 2013 (including Jane Berger, who was the art teacher inside G003 during 2013); (b) over one hundred (100) documents provided by The Laurel School, including work orders, emails, and even a picture of Room G003 as an art room during 2013, supporting the witnesses' statements

that Room G003 was an art room during 2013 without any sports equipment; and (c) over two-hundred (200) emails provided by defense counsel that **established an alibi for Plaintiff Newton for every single day** during the months of April and May of 2013 (when Defendant J. Ellis alleged the assaults to have occurred).

281.     Despite knowing that there was no probable cause to believe that Plaintiff Newton committed the offenses contained in the Indictment, Det. page continued to participate in the prosecution against Plaintiff Newton and, acting under color of state law, intentionally, and/or with deliberate indifference to, and/or with reckless disregard for, Plaintiff's Newton's clearly established constitutional rights to due process of law and a fair trial and/or for the truth, concealed/suppressed and/or destroyed Defendant J. Ellis' materially exculpatory second diagram, and therefore withheld the second diagram from the prosecuting attorney and the defense, in an attempt to secure an unlawful, unconstitutional conviction of Plaintiff Newton.

282.     Plaintiff Newton continued to suffer a deprivation of his liberty, as he remained on bond and subject to various bond conditions for several months, while Det. Page and the SH Defendants were in possession of Defendant J. Ellis' materially exculpatory second diagram, and while Det. Page was in the possession of the overwhelming amount of materially exculpatory evidence as alleged in ¶ 280, above.

283.     The criminal prosecution was resolved in Plaintiff Newton's favor because on May 11, 2017 the trial court dismissed the case against Plaintiff Newton with prejudice.

284.     As a direct and proximate result of Defendant Page and the SH Defendants' conduct, as set forth above, Plaintiff Newton was deprived of his constitutional right to

due process, and other damages, including but not limited to extreme emotional and psychological damage, pain and suffering, lost income and/or employment.

**COUNT FIVE**
**Failure to Investigate: Violation of 42 U.S.C. § 1983**

285.     Plaintiffs hereby reaffirm, reiterate, and incorporate by reference each and every allegation set forth throughout this Complaint as if fully set forth herein.

286.     Plaintiff as a citizen of the United States and of the state of Ohio, is accorded many rights, freedoms, and benefits under the United States Constitution and the Ohio Constitution.

287.     Within those constitutional rights accorded to Plaintiff are, *inter alia*, the right to privacy, the right to be free from unreasonable government seizures without probable cause and the right to be free from the deprivation of liberty without due process of law.

288.     Defendant Page possessed exculpatory evidence that she did not pursue prior to presenting the results of her investigation to the Cuyahoga County Prosecutor's office, and prior to testifying before the Cuyahoga County Grand Jury.

289.     Defendant Page knew that the inconsistencies and contradictions in Defendant J. Ellis' statements and drawings, coupled with the statements and drawings of numerous other witnesses, and the illogical, implausible and highly unlikely sequence of events regarding Defendant J. Ellis' allegations of sexual abuse consisted of exculpatory evidence that was favorable to Plaintiff Newton and prevented Defendant Page from believing that there was probable cause that Plaintiff Newton sexually assaulted Defendant J. Ellis.

290.     Despite possessing said exculpatory evidence, Defendant Page intentionally failed to further investigate Defendant J. Ellis' allegations and/or make any effort to learn any

information about Defendant J. Ellis that may be harmful to the State's case against Plaintiff Newton before encouraging, pursuing and/or perpetuating the presentment of the case to the Shaker Heights City Prosecutor, the Cuyahoga County Prosecutor, the Cuyahoga County Prosecutor and the Cuyahoga County Grand Jury, testifying before the Grand Jury, and continuing the unconstitutionally biased prosecution of Plaintiff Newton, knowing there was no probable cause to believe that Plaintiff Newton sexually assaulted Defendant J. Ellis.

291.    As a direct and proximate result of Defendant Page's conduct, as set forth above, Plaintiff Newton was subjected to unreasonable government seizures, without probable cause, and deprivations of his liberty without due process, specifically including but not limited to being required to post a $10,000.00 bond to secure his own pre-trial release, being placed on Court Supervised Release (CSR) as a condition of his bond, being required to check in with a pre-trial services officer weekly and/or bi-weekly, being subjected to drug screens through the CSR program, ordered to undergo mandatory HIV testing, and being prohibited from leaving the State of Ohio without prior court authorization, from September 26, 2016 through May 11, 2017, and all of which caused Plaintiff Newton to suffer damages, including but not limited to extreme pecuniary harm, extreme emotional and psychological damage, pain and suffering, lost income and/or employment, and Plaintiff Newton may incur more damage and/or loss in the future.

**COUNT SIX**
**Defamation (Libel and Slander) (Violation of Ohio law)**
**(The Ellis Defendants)**

292.    Plaintiffs hereby reaffirm, reiterate, and incorporate by reference each and every allegation set forth throughout this Complaint as if fully set forth herein.

293.     The Ellis Defendants made multiple false and defamatory verbal and written statements that Plaintiff Newton sexually assaulted Defendant J. Ellis, to third parties, including but not limited to the November 4, 2016 demand letter and Defendant J. Ellis' statements to law enforcement on March 29, 2017, and other false and defamatory verbal and written statements to be proven at trial.

294.     The Ellis Defendants' false written and verbal allegations against Plaintiff Newton accused Plaintiff Newton of sexual abuse and/or rape, crimes of moral turpitude.

295.     The Ellis Defendants published their false, defamatory allegations that Plaintiff Newton sexually abused Defendant J. Ellis to third parties without privilege.

296.     The Ellis Defendants made their oral and written statements accusing Plaintiff Newton of sexually abusing Defendant J. Ellis with actual malice and while knowing that their statements were false and defamatory.

297.     The Ellis Defendants' false written and verbal statements of sexual abuse were defamatory *per se* because their allegations that Plaintiff Newton sexually abused Defendant J. Ellis, then a juvenile and former player on Plaintiff Newton's middle school softball team, reflects upon Plaintiff's character in a way that caused him ridicule and injured him in his profession as it accused of committing crimes of moral turpitude. Defendant J. Ellis' false written and verbal statements of sexual abuse also caused Plaintiff Newton to be investigated, indicted, arraigned, subject to conditions of bond, and tried, from approximately October of 2014 to May of 2017.

298.     As a direct and proximate result of the Ellis Defendants' conduct, as set forth above, Plaintiff Newton suffered damages, including but not limited to considerable

pecuniary harm, extreme emotional and psychological damage, pain and suffering, lost income and/or employment.

**COUNT SEVEN:**
**Civil Conspiracy (Violation of Ohio Law)**

299.    Plaintiffs hereby reaffirm, reiterate, and incorporate by reference each and every allegation set forth throughout this Complaint as if fully set forth herein.

300.    Defendants maliciously combined together to have Plaintiff Newton charged and prosecuted on false allegations that he sexually abused Defendant J. Ellis.

301.    Defendant J. Ellis' and Defendant A. Ellis' false statements to Laurel school employees, administrators, as well as others, constituted unlawful acts.

302.    Defendant J. Ellis' false statements to law enforcement constituted unlawful acts.

303.    Defendant Jessica Page's failure to investigate, biased investigation, advocacy for Defendant J. Ellis, suppression/ withholding of materially exculpatory evidence as to Plaintiff Newton, and perjury to conceal the same, constituted unlawful acts.

304.    As a direct and proximate result of the conduct of Defendants as set forth above, Plaintiffs suffered damages, including but not limited to considerable pecuniary harm, extreme emotional and psychological damage, pain and suffering, lost income and/or employment.

**COUNT EIGHT**
**Malicious Prosecution (Violation of Ohio Law)**

305.    Plaintiffs hereby reaffirm, reiterate, and incorporate by reference each and every allegation set forth throughout this Complaint as if fully set forth herein.

306.    Defendant J. Ellis knowingly made numerous false statements to officials and/or employees of The Laurel School, Officers of the Shaker Heights Police Department,

representatives of the Cuyahoga County Prosecutor's Office, her therapist/ other professionals, employees of the Cuyahoga County and Summit County Child & Family Services, the public at large during her testimony at a criminal trial, and her personal friends and family members, that the Plaintiff Newton sexually assaulted her.

307.    Defendant J. Ellis knowingly made said statements with malice and in hopes of instituting criminal proceedings against Plaintiff Newton and in hopes of continuing the Plaintiff Newton's prosecution.

308.    Defendant J. Ellis knew that there was not probable cause to believe that the Plaintiff Newton sexually abused her.

309.    Defendant A. Ellis also made knowingly false statements to employees of The Laurel School, Officers of the Shaker Heights Police Department, representatives of the Cuyahoga County Prosecutor's Office, employees of the Cuyahoga County and Summit County Child & Family Services, and upon belief, her personal friends and family members, and others, that Plaintiff Newton sexually abused Defendant J. Ellis.

310.    Defendant A. Ellis knowingly made said statements with malice and in hopes of instituting criminal proceedings against Plaintiff Newton and in hopes of continuing the Plaintiff Newton's prosecution.

311.    Defendant A. Ellis knew that there was not probable cause to believe that the Plaintiff Newton sexually abused Defendant J. Ellis.

312.    Upon belief, Defendant R. Ellis also made knowingly false statements to employees of The Laurel School, Officers of the Shaker Heights Police Department, representatives of the Cuyahoga County Prosecutor's Office, employees of the Cuyahoga

County and Summit County Child & Family Services, and upon belief, his personal friends and family members, that Plaintiff Newton sexually abused Defendant J. Ellis.

313.     Defendant R. Ellis knowingly made said statements with malice and in hopes of instituting criminal proceedings against Plaintiff Newton and in hopes of continuing the Plaintiff Newton's prosecution.

314.     Defendant R. Ellis knew that there was not probable cause to believe that the Plaintiff Newton sexually abused Defendant J. Ellis.

315.     The criminal proceedings that the Ellis Defendants caused to be brought against Plaintiff Newton were terminated in the Plaintiff Newton's favor when, on May 11, 2017, Judge Nancy Margaret Russo dismissed the criminal case against Plaintiff Newton with prejudice.

316.     As a direct and proximate result of Ellis Defendants' conduct, as set forth above, Plaintiffs suffered damages, including but not limited to considerable pecuniary harm, extreme emotional and psychological damage, pain and suffering, lost income and/or employment.

## COUNT NINE
### Abuse of Process (Violation of Ohio Law)

317.     Plaintiffs plead Count Nine for Abuse of Process, in the alternative, to Count Eight, Malicious Prosecution, and Plaintiffs hereby reaffirm, reiterate, and incorporate by reference each and every allegation set forth throughout this Complaint, excluding those facts set forth under Count Eight relating to probable cause, as if fully set forth herein.

318.     By continuing to purposely assert her false claims of sexual assault against Plaintiff Newton, Defendant J. Ellis, with the knowledge of and/or encouragement of and/or pressure from, and/or in conspiracy with, Defendant A. Ellis and Defendant R.

Ellis, set in motion the criminal proceedings against Plaintiff Newton in the Cuyahoga County Court of Common Pleas.

319.     The Cuyahoga County Court of Common Pleas was the proper forum for the criminal case against Plaintiff Newton and the Cuyahoga County Grand Jury found probable cause to issue the criminal indictment against Plaintiff Newton.

320.     The Ellis Defendants perverted the criminal proceedings against Plaintiff Newton to accomplish an ulterior purpose for which the proceeding was not designed, specifically including, but not limited to, their attempted collection of $2,000,000.00 from The Laurel School in a pre-suit settlement demand.

321.     As a direct and proximate result of Ellis Defendants' wrongful use of process, as set forth above, Plaintiffs suffered damages, including but not limited to considerable pecuniary harm, extreme emotional and psychological damage, pain and suffering, lost income and/or employment.

**COUNT TEN:**
**False Light: (Violation of Ohio law)**
**(The Ellis Defendants)**

322.     Plaintiffs hereby reaffirm, reiterate, and incorporate by reference each and every allegation set forth throughout this Complaint as if fully set forth herein.

323.     The Ellis Defendants portrayed Plaintiff Newton before the public in a false light by making false statements, that Plaintiff Newton sexually assaulted Defendant J. Ellis on several occasions, to several people, including but not limited to, Laurel School administrators, the City of Shaker Heights Police Department, the Cuyahoga County Prosecutor's Office, employees of the Cuyahoga County and Summit County Child & Family Services, and upon belief, several friends, family members and acquaintances.

324.     Furthermore, the false statements of the Ellis Defendants were then reiterated before the Cuyahoga County Grand Jury, and the resulting criminal charges against Plaintiff Newton became public record.

325.     Furthermore, as stated throughout this Complaint, the false statements of Defendant J. Ellis resulted in several online articles being published and viewed by thousands of members of the public at large, all of which include Plaintiff Newton's name, some of which include Plaintiff Newton's picture, all of which reiterate Defendant J. Ellis' false allegations of sexual assault against Plaintiff Newton, and all of which remain available on the internet to the present day.

326.     The statements of the Ellis Defendants communicated something false about Plaintiff Newton – that he sexually assaulted Defendant J. Ellis on several occasions – and their falsity is demonstrated by:

(a) the statements of nearly ten (10) witnesses regarding Room G003 being an art room without any sports equipment inside during 2013 (including Jane Berger, who was the art teacher inside G003 during 2013);

(b) over one hundred (100) documents provided by The Laurel School, including work orders, emails, and even a picture of Room G003 as an art room during 2013, supported the witnesses' statements that Room G003 was an art room during 2013 without any sports equipment;

(c) over two-hundred (200) emails which **established an alibi for Plaintiff Newton for every single day** during the months of April and May of 2013 (when Defendant J. Ellis alleged the assaults to have occurred);

(d) Defendant J. Ellis made materially inconsistent statements to Laurel School officials, law enforcement, her therapist, and DCFS case workers regarding the alleged sexual assault;

(e) Defendant J. Ellis drew materially inconsistent diagrams of where the room where the alleged assaults occurred;

(f) the allegations against Plaintiff Newton were the result of a conspiracy by the Ellis Defendants to obtain a large financial settlement from Laurel;

(g) Defendant J. Ellis admitted during her testimony that she is "a pretty good liar," and;

(h) Defendant J. Ellis admitted in her testimony that, based on what she told Det. Page about when the sexual assaults allegedly occurred, the alleged sexual assaults by Plaintiff Newton against her could not have occurred.

327. The criminal charges against Plaintiff Newton were subsequently dismissed with prejudice.

328. The statements of the Ellis Defendants were highly offensive to a reasonable person as they purposefully and falsely accused Plaintiff Newton of committing one of the worst crimes imaginable – the rape and sexual assault of Defendant J. Ellis while she was a minor child and student athlete on Laurel Middle School's softball team for which Plaintiff Newton was the head coach.

329. As a direct and proximate result of the conduct of the Ellis Defendants, as set forth above, Plaintiff Newton was subjected to being publicly portrayed in a false light.

330. As a direct and proximate result of the conduct of the Ellis Defendants, as set forth above, Plaintiff suffered damages, including but no limited to extreme financial harm, emotional and psychological damage, pain and suffering, lost income and/or employment and injury to reputation and character.

**COUNT ELEVEN:**
**Intentional Infliction of Emotional Distress (Violation of Ohio law)**
**(Defendant Jessica Page and the Ellis Defendants)**

331.     Plaintiffs hereby reaffirm, reiterate, and incorporate by reference each and every allegation set forth throughout this Complaint as if fully set forth herein.

332.     Defendant Jessica Page's biased, bad faith, investigation of Plaintiff Newton, and her intentional, bad faith, malicious and unconstitutional suppression of the second diagram during her investigation into Plaintiff Newton for the purpose of preventing the second diagram from being disclosed to the defense, and the act of conspiring with Defendant J. Ellis and/or the Ellis Defendants to institute the criminal charges against Plaintiff Newton and to continue his prosecution, constitutes extreme and outrageous conduct by Defendant Jessica Page.

333.     Defendant J. Ellis' repeated bad faith and malicious false allegations of sexual assault against Plaintiff Newton constitutes extreme and outrageous conduct by Defendant J. Ellis.

334.     The Ellis Defendants conspiracy among themselves and/or with Defendant Jessica Page to institute the criminal charges against Plaintiff Newton and to continue his prosecution, constitutes extreme and outrageous conduct by the Ellis Defendants.

335.     The Ellis Defendants and Defendant Jessica Page acted intentionally and recklessly caused Plaintiffs to suffer severe emotional distress by their extreme and outrageous conduct.

336.     The Ellis Defendants and Defendant Jessica Page's extreme and outrageous conduct proximately caused Plaintiffs severe emotional distress.

337.     As a direct and proximate result of the Ellis Defendants and Defendant Jessica Page's extreme and outrageous conduct as set forth above, Plaintiffs suffered damages, including but not limited to extreme emotional and psychological damage, pain and suffering, lost income and/or employment.

### COUNT TWELVE
**Loss of Consortium: Violation of Ohio law**
**(Claim by Plaintiff Patricia Rideout against all Defendants)**

338.     Plaintiffs hereby reaffirm, reiterate, and incorporate by reference each and every allegation set forth throughout this Complaint as if fully set forth herein.

339.     Plaintiff Patricia Rideout is the wife of Plaintiff Mark A. Newton.

340.     Due to the injuries suffered by Plaintiff Mark A. Newton as a direct and proximate result of the intentional, malicious, extreme and outrageous acts of all Defendants, Plaintiff Patricia Rideout has suffered a loss of affection, society, companionship, services, and/or family relationship with her husband, Plaintiff Mark A. Newton, as well as financial harm for the attorney fees and expenses Plaintiffs incurred in defense of the criminal charges wrongfully levied against Plaintiff Mark A. Newton.

### COUNT THIRTEEN
**Failure to Intervene: Violation of 42 U.S.C. § 1983**
**(Claim by Plaintiff Newton against Detective Walter Siegel)**

341.     A police officer may be held liable for failing to prevent the violation of a citizen's constitutional rights by another law enforcement officer. *Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir. 1982).

342.     Det. Walter Siegel's tolerance, acquiescence and unconstitutional inaction and failure to intervene in the face of known federal Constitutional violations by Defendant

Page against Plaintiff Newton further evidences the City's and SHPD Illegal Policies/ Customs, as set forth above.

343.    Det. Siegel knew that Defendant Page's investigation into Plaintiff Newton constituted an ongoing violation of Plaintiff Newton's constitutional rights to due process and, if Defendant Page continued to investigate Plaintiff Newton in a manner consistent with her statements made to Defendant J. Ellis during the interviews, then further violations of Plaintiff Newton's constitutional rights would result, yet he failed to intervene to prevent the constitutional violations.

344.    As a direct and proximate result of Det. Siegel's failure to intervene in the face of known federal Constitutional violations by Defendant Page against Plaintiff Newton, Plaintiff Newton was deprived of his clearly established state and federal constitutional rights to due process of law and a fair trial and/or for the truth, and suffered damages including, but not limited to extreme emotional and psychological damage, pain and suffering, lost income and/or employment, significant financial harm for attorney fees and expenses incurred in defense of the criminal allegations wrongfully levied against him, and may incur more damage and/or loss in the future.

**DAMAGES**

345.    The actions of Defendants, jointly and severally, deprived Plaintiff of his constitutional and civil rights guaranteed under the United States Constitution and the Ohio Constitution.

346.    As a direct and proximate results of Defendants' actions, Plaintiff has suffered extreme financial, emotional and psychological damage as a result of being publicly and

falsely charged, prosecuted and tried for the rape and sexual assault of Defendant Jacquelyn Ellis.

347.    As a direct and proximate result of Defendants' actions, Plaintiffs suffered damages and injuries for which they are entitled to compensatory damages in an amount to be determined at trial.

348.    Defendants' actions were intentional, malicious, deliberate, reckless, wanton, and/or cruel, such as to justify an award of punitive damages to Plaintiffs.

349.    Furthermore, Plaintiffs suffered other injuries set forth in the other paragraphs of this Complaint.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Mark A. Newton and Plaintiff Patricia Rideout, by and through undersigned counsel, demands judgment in their favor as follows:

A.  Declare that the SH Defendants acts and/or omissions constitute violations of the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution, as well as 42 U.S.C. § 1983, the Ohio Constitution, and the applicable statutory and common law of the State of Ohio;

B.  Declare that the SH Defendants are vicariously liable for its employees' acts, as described above, based on the City of Shaker Heights' custom, policy and/or practice of deliberate indifference to the constitutional rights, privileges, and/or immunities of citizens of the United States and/or community at large, that would cause a constitutional violation, *and which in fact caused* a violation of Plaintiff Newton's state and federal constitutional rights to due process of law and a fair

trial pursuant to the Ohio Constitution and the Fifth, Sixth and Fourteenth Amendment to the United States Constitution;

C.  Enter judgment in Plaintiffs favor on all claims for relief;

D.  Award Plaintiffs full Compensatory Damages against all Defendants in an amount in excess of twenty-five thousand dollars ($25,000.00), specifically including compensatory damages for the attorneys fees and expenses Plaintiffs spent defending the criminal charges against Plaintiff Newton, with the specific amount to be shown at trial;

E.  Award Punitive Damages for the Defendants' egregious, willful, and malicious conduct, in an amount in excess of twenty-five thousand dollars ($25,000.00), with the specific amount to be shown at trial to be shown at trial;

F.  Award Plaintiffs the costs incurred in this action and reasonable attorney fees pursuant to 42 U.S.C § 1988;

G.  For pre-judgment interest; and

H.  For any and all other relief to which Plaintiffs may be entitled.

Respectfully Submitted,

/s/ Larry W. Zukerman , Esq.
LARRY W. ZUKERMAN, Esq. (0029498)
PAUL B. DAIKER, Esq. (0062268)
ADAM M. BROWN, Esq. (0092209)
Zukerman, Daiker & Lear Co., L.P.A.
3912 Prospect Avenue, East
Cleveland, Ohio 44115
Phone: (216) 696-0900
Facsimile: (216) 696-8800
lwz@zukerman-law.com
pbd@zukerman-law.com
amb@zukerman-law.com
Counsel for Plaintiffs

## **JURY DEMAND**

Pursuant to Rule 38(b)(1) of the Federal Rules of Civil Procedure, Plaintiffs request a jury trial on all issues and claims set forth in this Complaint.


/s/ Larry W. Zukerman, Esq.
LARRY W. ZUKERMAN, Esq.
PAUL B. DAIKER, Esq.
ADAM M. BROWN, Esq.